410 N.W.2d 572 (1987)
In the Matter of J.Z., Alleged Dependent and Neglected Child.
No. 15473.
Supreme Court of South Dakota.
Considered on Briefs April 24, 1987.
Decided August 12, 1987.
Rehearing Granted September 25, 1987.
*573 Douglas E. Kludt, of Churchill, Manolis & Freeman, Huron, for appellant.
Roger A. Tellinghuisen, Atty. Gen., and Janice Godtland, Asst. Atty. Gen., Pierre, for appellee.
SABERS, Justice.
L.Z. (Mother) appeals from a decree of disposition which terminated her parental rights over her son J.Z. We reverse.

FACTS
J.Z. was born on April 20, 1983. Mother is single and was 26 years old at the time of the dispositional hearing. During 1985 the South Dakota Department of Social Services (Department) received several referrals alleging that Mother slapped J.Z. and slammed him down into a sandbox. A social worker contacted Mother and discussed these referrals with her. During these meetings, Mother denied that she slapped J.Z. None of these claimed events were either pursued or proven at subsequent court hearings. On December 18, 1985, a day care provider notified Department that J.Z. had two cuts on the top of his head, each being about one inch long. Mother explained that J.Z. was hurt when he threw coffee cans up in the air and they fell on his head. As a result of this incident, a petition was filed alleging that J.Z. lacked proper parental care and was a dependent and neglected child.
During the hearings on this matter, a psychologist testified that Mother suffers from paranoid schizophrenia. The illness caused her at one time to caulk and tape the windows, vents, and doors of her apartment to keep out the devil and other unwanted people; she also placed large chains on her cupboards so that no one would steal her food. The illness is now in remission, however, and Mother is neither hallucinating nor delusional. Despite this improvement, the psychologist stated that Mother's thinking, reasoning, and emotions bear the major elements of the schizophrenic process; this can lead to a rigid style of behavior, limited ability to deal with stress, preoccupation with her own needs, and poor judgment. The psychologist added that he believes Mother's inability to cope with stress poses a "severe potential threat" of injury to J.Z. Mother claims this testimony should be discounted because the psychologist never observed her in the presence of J.Z.
Based primarily on the testimony of the psychologist, the trial court found that 1) Mother's psychiatric condition cannot be eliminated through treatment; 2) Mother's psychiatric condition is not likely to improve; 3) Mother's difficulty in dealing with stress poses a severe potential threat of injury to J.Z.; 4) Mother does not possess the capability to provide a suitable home or proper parental care for J.Z.; 5) efforts to improve Mother's parenting skills have proven unsuccessful; and 6) placing J.Z. back into Mother's custody would endanger his physical, emotional, and psychological well-being. As for any physical abuse, the trial court found insufficient evidence to sustain the charge of inappropriate discipline or to show any fault on the part of Mother with respect to the cuts on J.Z.'s head. The trial court concluded that termination of Mother's parental rights is in the best interests of J.Z.

MOTHER'S CLAIMS
On appeal Mother argues that the trial court's findings are clearly erroneous and that there was not clear and convincing evidence to support the termination of her parental rights. She maintains that she *574 should be given a chance to improve herself and address her problems. We agree.

WAS EVIDENCE SUPPORTING TERMINATION CLEAR AND CONVINCING?
In termination cases, the trial court must find by clear and convincing evidence that termination of parental rights is in the child's best interests; the state must also show that there is no narrower means of providing for the best interests and welfare of the child. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); People in Interest of T.H., 396 N.W.2d 145 (S.D.1986); Matter of S.M., 384 N.W.2d 670 (S.D.1986). Clear and convincing evidence is evidence that is so clear, direct, weighty, and convincing so as to allow the trier of fact to reach a clear conviction of the precise facts at issue without hesitancy as to their truth. Matter of S.H., 337 N.W.2d 179 (S.D.1983). The clear and convincing standard must be applied in both the adjudicatory and dispositional stages of a termination proceeding. Matter of D.B., 382 N.W.2d 419 (S.D.1986).
Termination of parental rights is a drastic, final step that should be exercised with great caution, Matter of S.H., supra, but in determining whether to terminate parental rights, the paramount consideration is the best interests and welfare of the child. People in Interest of S.M.M., 349 N.W.2d 63 (S.D.1984). This court will not overturn the trial court's findings of fact unless they are clearly erroneous. Matter of D.H., 354 N.W.2d 185 (S.D.1984).
A review of the record reveals that Mother is not a perfect parent. She has suffered greatly from paranoid schizophrenia. Psychological testing indicates that she has some alcohol or chemical dependency. Mother pleaded guilty to one charge of DWI, and J.Z. was in the car with her when she was arrested. On occasion Mother has taken J.Z. into bars. A community counseling agency offered "partial care" services to Mother to expose her to positive and appropriate socialization, recreation, and educational activities. However, the project director had to ask Mother to leave the program because she was uncooperative and belligerent; consequently, Mother did not complete the program. On three occasions the manager at Mother's apartment house heard J.Z.'s uninterrupted crying; one time it lasted for thirty minutes, another time for forty-five minutes, and a third time for ninety minutes.
On the other hand, the record reveals many positive aspects about Mother. Very important is the fact that she has made great strides in dealing with her schizophrenia. Antipsychotic drugs have had a beneficial effect upon Mother and her condition has definitely improved over time. The illness is in remission and she is no longer hallucinating. The psychologist admitted on cross-examination that many schizophrenics successfully raise children and that about 25% of them recover entirely and remain recovered. Further, the trial court clearly erred when it found that Mother's condition is not likely to improve. Actually, the psychologist testified that Mother's condition is not likely to deteriorate, and he said the tendency is that it would improve. To this extent, Finding of Fact number 4 on disposition was clearly erroneous. SDCL 15-6-52(a).
The social worker testified that there are no other programs to assist Mother other than the ones Department has provided. However, the family support worker stated that Mother seemed to be cooperative with her efforts. Even though the social worker questioned whether Mother understood the concepts of toilet training, parenting, and nurturing, she admitted that she saw improvement in Mother's problem areas.
The record clearly indicates that Mother loves J.Z. and shows him affection; J.Z. also shows affection for Mother. Mother appears to be a neat and tidy housekeeper. J.Z. was always dressed appropriately and cleanly and Mother fixed good, well-balanced meals for him. Evidently, Department had no complaints whatsoever in this regard. Also, despite the claims in the record regarding alcoholism, there was no evidence that Mother becomes intoxicated on a regular basis.
*575 Finally, we note that this is not a case of physical abuse. There was insufficient evidence presented at the hearings to sustain charges of inappropriate discipline or to show any fault on the part of Mother with respect to the cuts on J.Z.'s head. This is significant in light of the social worker's testimony that but for the two cuts found on the child's head, the petition alleging dependency and neglect would never have been filed. In summary, it is difficult to conclude that the evidence in support of termination was clear and convincing.
In close cases such as this, we must keep in mind that "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." Santosky v. Kramer, 455 U.S. at 753, 102 S.Ct. at 1394-1395, 71 L.Ed.2d at 606. After examining all of the evidence, we conclude that less restrictive alternatives to termination exist and that the evidence in support of termination was not sufficiently clear, direct, weighty, and convincing to justify the termination of Mother's parental rights.
Reversed.
MORGAN and HENDERSON, JJ., concur.
WUEST, C.J., and MILLER, J., dissent.
MILLER, Justice (dissenting).
I dissent. The majority totally overlooks or disregards two major concerns: (1) the appropriate scope of review, and (2) the best interests of the child.

SCOPE OF REVIEW
The majority plays lip service to the appropriate "clearly erroneous" test, In re D.H., 354 N.W.2d 185 (S.D.1984), then proceeds to second guess the trial court. The majority suggests that this is a "close case" and then holds that "the evidence in support of termination was not sufficiently clear, direct, weighty, and convincing to justify the termination of the Mother's parental rights." These seem to me to be inconsistent observations.
Our standard of review is to determine whether the trial court was clearly erroneous in finding the evidence supporting termination was clear and convincing. People in Interest of T.H., 396 N.W.2d 145 (S.D. 1986); In re S.M., 384 N.W.2d 670 (S.D. 1986); People in Interest of M.W., 374 N.W.2d 889 (S.D.1985); In re S.S., 334 N.W.2d 59 (S.D.1983). The majority arguably suggests that the trial court's findings were clearly erroneous; however, it was never specifically so statedperhaps because the trial court in reality was not clearly erroneous. In my view, from reviewing the record, the trial court appropriately applied the "clear and convincing evidence standard of proof." Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Additionally, the trial court appropriately followed the correct standard in applying the least restrictive alternative viewed from the child's point of view. People in Interest of C.L., 356 N.W.2d 476 (S.D.1984).
I do not concede that this is a "close case," and I certainly am not left with a definite and firm conviction that the trial court committed a mistake, D.H., supra, nor that its findings of fact were clearly erroneous. SDCL 15-6-52(a); People in Interest of G.H., 390 N.W.2d 54 (S.D.1986); In re A.M.L., 371 N.W.2d 358 (S.D.1985); D.H., supra; S.S., supra. I would affirm.

BEST INTERESTS OF THE CHILD
I wholeheartedly agree with the majority's statement that the mother is not a "perfect parent."
Further, as stated by the majority, the least restrictive alternatives must be applied. However, the least restrictive alternative must be viewed from the child's point of view, not the parents. C.L., supra. The prime concern of the court is the child and the child's best interests must prevail. C.L., supra; In re R.Z.F., 284 N.W.2d 879 (S.D.1979). Children are entitled to stability and certitude in their lives. S.S., supra.
*576 In addition to recognizing the paramount best interests of the child, the trial court noted that parental rights can be terminated only upon a showing that services to the family are unavailing. R.Z.F., supra; In re M.S.M., 320 N.W.2d 795 (S.D.1982); In re S.M.M., 349 N.W.2d 63 (S.D.1984). Here, Mother failed to complete a "partial care" services program offered by the Community Mental Health Center, and was asked to leave because she was uncooperative, beligerent and resented authority. Further, although she attended the basic parenting (STEP) program offered by the Department of Social Services, she did not or would not use the concepts taught there.
The majority opinion specifically holds that Finding of Fact IV was clearly erroneous in its finding that Mother's condition is not likely to improve. Viewing the psychologist's (Dr. Dame) testimony as a whole, that finding is not clearly erroneous. Dr. Dame testified that in his opinion the mother's mental illness was life-threatening to J.Z. and that "there is a severe potential threat as a result of that illness." In defining "potential" Dr. Dame went on to say:
... in that (Mother) is extremely deficient in those resources that allow her to cope with the normal and abnormal amounts of stress. Under conditions of stress, this lady's ability to think and to reason and to behave appropriately can deteriorate rapidly with the use of alcohol or other mood-altering chemicals. We can see a major deterioration in her behaviorial appropriateness. And it's as a result of that weakness in her coping ability that the safety and wellbeing of the child is in jeopardy. The kinds of stresses that I am talking about are the kinds of stresses that most of us encounter often. And these stresses will likely lead to a deterioration in this lady's psychiatric condition wherein she has difficulty accurately interpreting and understanding reality.
Other evidentiary factors supporting the trial court's decision, which must be recognized in this review, include the following: Psychological testing showed a strong, high probability of alcohol or chemical dependency on the part of Mother; Mother was previously committed to the Human Services Center because she was psychotic and a danger to herself and/or others (this was during her pregnancy with J.Z., and, in fact, he was delivered in Yankton); after thorough and extensive evaluations, Dr. Dame recommended termination of Mother's parental rights. After having dealt with Mother for nearly one year, Dr. Dame concluded, among other things, that she would have difficulty understanding some of the conceptual foundations of discipline, that she has had trouble understanding parental skills, and that, under periods of stress, she would be likely to strike out at the child. The apartment manager had seen Mother intoxicated various times, had heard J.Z. crying continuously on at least four occasions, one for one-half hour, another three-fourths hour, another one hour and another for an hour and a half; manager also testified that Mother left J.Z. unattended numerous times and that on one occasion Mother had tied the child to a bicycle seat so tightly with twine that it left red marks on him. A neighbor saw Mother strike J.Z. in the face on three or four occasions, once grabbing him by the hair. Neighbor further testified that she had seen J.Z. various times with unexplained bruises. According to the testimony, there were at least four other referrals to the Department of Social Services of alleged neglect of the child, but for some unexplained reason the deputy state's attorney chose not to call them as witnesses.
Certainly there are many good things that can be said about Mother. All of us are sympathic to her mental illness and her intellectual deficiencies. However, sympathy can play no part in this decision. We must also remember that her remission from mental illness seems to rely upon continued treatment. As observed by Dr. Dame, there is a danger, considering Mother's intellectual capabilities, that she will not be able to continue to recognize and appreciate the importance of the continued treatment. This fact alone poses a severe potential threat to J.Z.
The trial court had an opportunity to view the witnesses, to listen to their testimony *577 and to determine their credibility. In this most difficult case, he arrived at a decision which I am sure was not easy and certainly heart-rendering. His decision, considering all of the facts, was not clearly erroneous. It should be affirmed.
I am authorized to state that Chief Justice WUEST joins in this dissent.