**In the Matter of S.D., K.C.H., and L.W., Alleged Dependent Children.**

**Nos. 15422, 15428.**

Supreme Court of South Dakota.

Argued Jan. 13, 1987.

Decided March 11, 1987.

John A. Schlimgen of Doyle, Mahoney & Lyons, Sioux Falls, for appellant Mother.

Steven G. Haugaard of Hunt & Haugaard, Sioux Falls, for appellant Father.

Peter Gregory, Sioux Falls, for appellee Children.

Janice Godtland, Asst. Atty. Gen., Pierre, (Mark V. Meierhenry, Atty. Gen., Pierre, on the brief), for appellee State.

HENDERSON, Justice.

## INDIAN CHILD WELFARE ACT/TERMINATION OF PARENTAL RIGHTS

Parental rights of F.W. (hereinafter referred to as Mother) and L.D.W. (hereinafter referred to as Father) were terminated as to female children S.D., K.C.H., and L.W. Both K.C.H. and L.W. possess sufficient quantities of American Indian blood to require application of the Indian Child Welfare Act (ICWA). S.D. is Caucasian. Parents contend their rights were improperly terminated. Error by the trial court was committed, they maintain, when it concluded:

(1) With reference to K.C.H. and L.W. only, sufficient expert testimony (as mandated by ICWA) supported termination of parental rights.

(2) Reasonable and active efforts were made to rehabilitate and prevent the dissolution of the W. family in accordance with both state and federal directives.

(3) Their continued custody of the children was likely to result in serious emotional or physical damage to said children.

(4) Termination of parental rights was the least restrictive alternative.

(5) Their Stipulation of Dependency and Neglect was improperly accepted when the standard of proof for termination of rights was not determined

at that time. This issue is raised only by Father.

We affirm on all issues.

## FACTS

Mother, a Caucasian, age forty-five, is the natural mother of three girls, namely: S.D. (born February 25, 1970), K.C.H. (born October 23, 1979), and L.W. (born July 16, 1981). Mother is married to Father, age thirty-eight, an enrolled member of Omaha Tribe, who is the natural father of only L.W. L.W. was certified as eligible for enrollment in the Omaha Tribe.[1] K.C.H. is an enrolled member of Rosebud Sioux Tribe.[2] S.D. has no tribal affiliation, as she is Caucasian, born of a white mother and father. Having failed to perfect their appeals, S.D.'s father and K.C.H.'s father are not parties to this action.

Father has an associate degree and has expressed interest in becoming a nurse. He operated a foster-type care program, together with his wife, in 1980 or 1981.

Mother has attended college for business administration. She has worked as a waitress in addition to her involvement in the foster program identified above.

The W. family has had contacts with Department of Social Services (DSS) since at least 1981. Alcohol abuse was and continued to be the family's main problem. Mother and Father have exhibited repeated inability to control their intake of liquor. Both Mother and Father have a sordid history of alcohol abuse, with attendant arrests, contemplated suicide, repeated violence in the home, unconsciousness, moves throughout South Dakota and the nation, brief stays in missions and halfway houses, temporary periods of residence at detoxification centers, sporadic attendance at A.A. meetings, disorderly conduct, and various other episodes created by chemical dependency.

Shortly after the January 29, 1986 Dispositional Hearing, Mother entered an inpa-

---

1. The Omaha Tribe sent a Notice of Intent reflecting no plan to participate in the State Court proceedings.

2. On January 29, 1986, the trial court allowed the Rosebud Sioux Tribe to intervene "for purposes of placement."

tient alcohol treatment program at River Park in Sioux Falls and successfully completed a thirty-day program. She appeared at one of six Dispositional Hearings and did not testify.

Father appeared at three of six Hearings. He was under the influence of alcohol at one hearing. To secure his presence at the final hearing (March 26, 1986), Father had to be transported from jail as he had been arrested for burglary and assault. Additionally, he had been a client at the Arch Halfway House—Sioux Falls Detoxification Center on January 4, 25, and 27, 1986.

S.D., the oldest daughter, testified that she did not wish to return to Mother and Father nor to either one individually. She stated she was often denied food, clothing, Christmas presents, medical care, educational opportunities and the normal care and attention a child needs from parents as a result of Mother's and Father's almost constant alcohol abuse and transient lifestyle. S.D. testified that she, more than her parents, had cared for her two young sisters. S.D. requested not to be returned to her Mother and Father as she wished stability in her life and had made some friends in the Sioux Falls area; she specifically asked to remain in foster care. S.D. also added that she felt her half sisters should not be returned to Mother or Father. This testimony was highly damaging to Mother's and Father's request to keep the children.

K.C.H. underwent medical and psychological treatment centering upon self infliction of sores and lesions on her arms and legs. Psychological assessment, by Dr. Dickinson, indicated that this behavior resulted from family instability. A constantly stable environment was recommended.

The trial court acknowledged that ICWA applied to K.C.H. and L.W. ICWA recites that termination of parental rights requires a showing beyond a reasonable doubt that continued custody of the child by the parent or Indian custodian would result in serious emotional or physical damage to the child. The clear and convincing standard was used regarding S.D., a Caucasian, who is half-sister to K.C.H. and L.W.

Findings of Fact and Conclusions of Law were entered by the trial court on May 16, 1986. Mother and Father were found to be unfit parents. The best interests of parents and children were considered and termination of all parental rights was the least restrictive alternative commensurate with children's best interests, per the trial court's holding.

Mother and Father have separately appealed. We have consolidated these appeals for convenience, clarity, and dual consideration. Each claimed error, set forth above, is treated seriatim.

## DECISION

### I.

ICWA provides:

No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(f) (1982). Appellants contend that expert testimony, of the caliber mandated by ICWA, was lacking in this case. Appellants make reference to federal guidelines which identify three possible types of expert witnesses.

(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(iii) A professional person having substantial education and experience in the area of his or her specialty.

44 Fed.Reg. 67,584, at 67,593 (Nov. 26, 1979). Appellants conclude that their parental rights to K.C.H. and L.W. were improperly terminated. We do not agree.

■ Qualification of experts and admission of their testimony are matters which fall within the trial court's sound discretion. *In re J.L.H.*, 316 N.W.2d 650, 651 (S.D.1982); *State v. Iron Shell*, 301 N.W.2d 669, 672 (S.D.1981); *State ex rel. Helgerson v. Riiff*, 73 S.D. 467, 475, 44 N.W.2d 126, 130 (1950). A trial court's rulings in this area will be disturbed on appeal only if its discretion was clearly abused. *In re J.L.H.*, 316 N.W.2d at 651; *Iron Shell*, 301 N.W.2d at 372; *Riiff*, 73 S.D. at 475, 44 N.W.2d at 130. In this case, a veritable plethora of witnesses possessing expert credentials testified regarding the situation of family W. Any number of these witnesses would satisfy both state and federal regulations regarding expert testimony.

■ We note that federal guidelines quoted above are only guidelines and do not have binding legislative effect. 44 Fed. Reg. 67,584 (Nov. 26, 1979). In this case, expert testimony was elicited from individuals who would undoubtedly satisfy the *recommendation* of that provision.[3] The fact-finder's decision was properly considered and supported by testimony of experts and we so hold. We refer to *In re K.A.B.E.*, 325 N.W.2d 840, 843 (S.D.1982), and a similar attack under the ICWA. Here, we note that Social Worker Thompson had supervised over 300 Indian family cases during her ten years of work experience and was involved in a supervisory capacity in the W. family case for approximately six months. Social Worker Baldwin's expertise with Indian families was limited to five to ten families over a four-year period. We refer to (12) of footnote 3

3. The following persons testified:
    (1) Dr. Gary Dickinson, psychologist—testified regarding K.C.H.'s lesions. He recommended "a very consistent, stable home environment" and added in his opinion "self-inflicted lesions and the depression [were] related to the lack of stability in the home situation."
    (2) Sioux Falls Social Worker Merlyn Baldwin—stated that unstable family environment would result in emotional or physical damage if S.D., K.C.H., and L.W. remained in parental custody.
    (3) Sioux Falls Supervising Social Worker Linda Thompson—testified she was Baldwin's (*supra*) supervisor and noted that DSS rehabilitative resources for W. family were exhausted. She recommended that the children be removed for their own well being as no form of rehabilitation is possible until parental alcoholism is confronted and corrected.
    (4) Sister Ranek, Ph.D., counselor at Sacred Heart Convent—testified that Father is an alcoholic whose prognosis is guarded. She said he needed an initial structured inpatient treatment, followed by a continuing outpatient program.
    (5) Chuck Currie, counselor at Aberdeen's Northern Alcohol Drug and Referral Center—testified that Father is evaluated as alcohol dependent.
    (6) Chuck Evans, counselor at Aberdeen's Northeastern Mental Health Center—testified that Father has severe alcohol dependency problems and Mother had mild-moderate problems. He also noted that family problems would escalate until the couple dealt with their alcohol problems.
    (7) Kris Ziebell, supervisor of Chemical Dependency Unit at Yankton—testified as to Father's inclusion at Yankton and notes his problems with alcohol and his premature exit from the program.
    (8) Police Officers Ensenbach (Yankton) and Wilson (Sioux Falls) testified as to separate instances involving problems with Father and Mother.
    (9) Randy Frey, administrator of Arch Halfway House, Sioux Falls Detoxification Center—testified as to Father's voluntary admissions unto said center.
    (10) Barb Peterson, social worker, Aberdeen—testified as to repeated problems Mother and Father had with alcohol.
    (11) Marilyn Hawkins, director of patient care at River Park in Sioux Falls—testified as to Mother's voluntary inpatient attendance, and successful completion of one-month program. Noted Mother's problem was intertwined with Father's alcohol problem and that Mother was more apt to continue recovery if she was away from Father.
    (12) Rick Thomas (a half-blooded Indian, born and raised in the Santee Sioux Tribe of Nebraska), clinical program director at Native Alcohol Treatment Center in Iowa—testified that repeated parental violence neglect and alcoholism could have severe negative impact upon their children.

to further buttress the expertise of Indian input and expert opinion concerning these children.

We do not believe the ICWA was intended as a shield to permit abusive treatment of Indian children by their parents. Children should not be abused, neglected, or forlorned under the guise of cultural identity.

## II.

Appellants assert that State did not actively attempt to rehabilitate the W. family prior to termination of parental rights. *See* 25 U.S.C. § 1912(d) (1982), requiring active efforts "to provide remedial services and rehabilitative programs...." This claim is based in large part on the alleged failure of Sioux Falls Social Worker Baldwin to take active steps to reconstruct the family situation. We find this argument to be without merit.

Social Worker Baldwin may have been less adept at coordinating and making available various resource personnel and facilities than other social workers, as Appellants claim. But we must bear in mind that Mother and Father had adopted a particularly nomadic lifestyle which made contacting them difficult. In a span of a few years, they lived in Sioux Falls, Aberdeen, Mitchell, and Yankton, South Dakota; additionally, they lived in the states of Nebraska, New Mexico, Florida, and Louisiana. This Court does not decide factual issues de novo. We take special note of Findings of Fact XX and XXI, wherein the trial court finds:

Reasonable efforts were made to prevent or eliminate the need for removal of the children and to make it possible for the children to return home.

Appropriate services to the family have failed and further services would be unavailing.

Moreover, we need not decide if this Court would have entered a mirror image of the trial court's findings. Rather, we must determine if the "entire evidence leaves a definite and firm conviction that a mistake has been committed." *In re T.H.*, 396 N.W.2d 145, 148 (S.D.1986) (citing *Wiggins v. Shewmake*, 374 N.W.2d 111 (S.D.1985) and *In re D.H.*, 354 N.W.2d 185, 188 (S.D. 1984)).

█ A review of the evidence in this case reveals that Mother, Father, and children had received services from DSS dating from 1981. Food, shelter, medical treatment, transportation, clothing, and various counseling services were provided to family members. We should remain mindful that "[t]ermination of parental rights is not conditioned on exhaustion of every possible form of assistance," *In re J.S.N.*, 371 N.W.2d 361, 364 (S.D.1985) (citing *In re C.L.*, 356 N.W.2d 476 (S.D.1984)), and where reasonable efforts "to aid or counsel parents by the use of social services proves unavailing, termination of parental rights is justified." *In re J.S.N.*, 371 N.W.2d at 364 (quoting *In re S.S.*, 334 N.W.2d 59, 62 (S.D.1983)). *See In re T.H.*, 396 N.W.2d 145. We conclude that State, by exhaustive effort, made every reasonable effort to keep the W. family together.

## III.

Appellants advocate that it was not shown that their further custody of S.D., K.C.H., and L.W. would result in serious emotional or physical damage to the children. They conclude, therefore, that their parental rights were improperly terminated. We also determine this argument to be unpersuasive.

Once again, Appellants request that we re-find the facts in this case. "We are not in a fact-finding business ...," *Hanson v. Hanson*, 397 N.W.2d 656, 657 (S.D.1986) (Henderson, J., concurring specially), and a trial court's decision will be overruled only when this Court is firmly convinced that the trial court's decision is clearly erroneous. *In re S.M.*, 384 N.W.2d 670, 673 (S.D.1986).

█ In this case, testimony abounds regarding the violent and intoxicated behavior exhibited by both Appellants. This family rarely had a room, let alone an apartment, of their own. Shelters and mis-

sions were commonplace abodes. Shortages of food, clothing, medical and parental supervision were constant companions to these girls.

S.D. testified she did not wish to return to Mother or Father, wanted a permanent home, and would run away if returned to Appellants. K.C.H. suffered self-inflicted lesions and her psychologist testified that he thought a lack of stability was the cause. Other witnesses testified to the necessity of removing the girls from Appellants' presence when Appellants were fighting and intoxicated. The law should permit children to "grow and flourish." *In re J.S.N.*, 371 N.W.2d at 365. *See In re C.L.*, 397 N.W.2d 81, 89 (S.D.1986) (Henderson, J., concurring in result). Past actions of parents speak louder than do their promises to improve in the future. *In re J.M.V.D.*, 285 N.W.2d 853, 855 (S.D.1979). We are unable to conclude that a mistake has been made at the trial court level.

### IV.

Appellants assert that termination of parental rights was not the least restrictive alternative. We disagree.

In these cases, the trial court is required to balance the fundamental rights of a parent to raise his or her child with the State's compulsion in protecting that child's best interests. *In re P.M.*, 299 N.W.2d 803, 807 (S.D.1980). But, the best interests of the child must always prevail. *S.M.*, 384 N.W.2d at 673–74.

■ To terminate parental rights, State must show that no narrower means of providing for the best interests and welfare of the child exists. *S.M.*, 384 N.W.2d at 674. This least restrictive alternative determination must, however, be viewed from the child's point of view. *In re C.L.*, 356 N.W.2d 476, 478 (S.D.1984).

■ Parental rights may be terminated if proffered State services are unaccepted or unsuccessful. *See In re M.S.M.*, 320 N.W.2d 795, 799 (S.D.1982). In this case,

both Mother and Father have consistently failed to control their alcohol problems. The record is replete with instances of alcohol-related treatment and failure. During the Dispositional Hearing, Mother was receiving inpatient alcohol treatment. While this is commendable, we hold that it is too little, too late. Father appeared at one hearing while under the influence of alcohol. We conclude the trial court's termination of parental rights was not clearly erroneous and will not be disturbed on appeal.

### V.

Appellant Father urges that at the time he signed the Stipulation of Dependency and Neglect, he was unaware that the beyond a reasonable doubt burden of proof (via ICWA) must be satisfied before his parental rights to L.W. was terminated. He claims prejudice therefrom and identifies the proper remedy as a reversal and remand. We disagree.

First of all, no authorities were cited in support of his contention. *See Corbly v. Matheson*, 335 N.W.2d 347, 348 (S.D.1983) (quoting *State v. Shull*, 331 N.W.2d 284, 285 (S.D.1983)); *see also Graham v. State*, 328 N.W.2d 254, 255 n. 2 (S.D.1982). It therefore could be well argued that Father has waived his argument.

■ However, we shall address it in chief upon the following basis: First, this Court has expressly identified the evidentiary standard at an adjudicatory stage in a state proceeding under ICWA as "clear and convincing evidence." *K.A.B.E.*, 325 N.W.2d at 843. Second, we further noted in *K.A.B.E.* that the evidentiary burden increases to beyond a reasonable doubt when termination of parental rights is sought. *Id.* Third, in a Stipulation, there are no findings of fact, per se, as pertinent facts have been agreed upon by the parties and, here, both Father and Mother were represented by counsel prior to and during the signing of said Stipulations. Lastly, a

burden of proof would have no place or posture in a stipulation.

Affirmed in all respects.

WUEST, C.J., MORGAN and SABERS, JJ., concur.

MILLER, J., concurs specially.

MILLER, Justice (concurring specially).

Appellants L.W. and F.W. allege many technical deficiencies or omissions by the Department of Social Services and the trial court. Their argument appears scholarly and persuasive until one notes the remarkable absence of any claim that reversal of the trial court would be in the best interests of the children. Have appellants lost sight of the well-established principle in these cases that the best interests of the children is paramount? SDCL 26–8–36; *Matter of M.C.*, 391 N.W.2d 674 (S.D.1986); *People in Interest of P.B.*, 371 N.W.2d 366 (S.D.1985); *People in Interest of J.S.N.*, 371 N.W.2d 361 (S.D.1985); *People in Interest of C.L.*, 356 N.W.2d 476 (S.D.1984); *People in Interest of S.L.H.*, 342 N.W.2d 672 (S.D.1983); *In re M.S.M.*, 320 N.W.2d 795 (S.D.1982). Neither in their briefs nor in their oral arguments have appellants claimed that they are fit parents, that the family is rehabilitative, or that the best interests of the children mandate their return to their parents. Rather, they merely attack the alleged deficiencies in the State's presentation.

Further, the Indian Child Welfare Act issues raised by appellants have clouded the crucial issue, namely the best interest of the children. Admittedly, since two of the children are Indian the ICWA must be considered and applied. However, we are not dealing with cultural differences—rather, we are dealing with neglect of children. Here, we have alcoholic,* neglectful, abusive parents, whose race is irrelevant. No one would claim that the lifestyle of appellants was that of traditional Indians. To

the contrary, the Indian culture is steeped in high family values and love of children.

---

* The majority opinion indicates that the mother has "successfully completed" in-patient alcoholism treatment. Although some improvement has been shown, I am not persuaded that she can truly be characterized as a recovered alcoholic. As the saying goes, "the jury is still out" on that issue.