428 N.W.2d 521 (1988)
In the Matter of the Alleged Dependent and Neglected Status of S.W., J.B., M.B., B.B., and R.B.
Nos. 16038, 16044.
Supreme Court of South Dakota.
Considered on Briefs May 26, 1988.
Decided August 17, 1988.
*522 Janice Godtland, Asst. Atty. Gen., Pierre, for appellee State of S.D.; Roger A. Tellinghuisen, Atty. Gen., Pierre, on brief.
Michael J. Butler, Minnehaha County Public Defender, Sioux Falls, for appellant Mother.
Scott E. Kading, Sioux Falls, for appellant Father.
Steven G. Haugaard of Hunt, Haugaard & Rahn, Sioux Falls, for Children.
MORGAN, Justice.
On February 23, 1987, the State of South Dakota (State), filed a complaint alleging that I.S.'s (mother) five children were dependent and neglected. At the adjudicatory hearings on May 8 and May 15, 1987, the trial court declared S.W. (dob 12/16/74), J.B. (dob 10/12/76), M.B. (dob 1/10/78), B.B. (dob 3/23/79), and R.B. (dob 3/9/81) (collectively the children) to be dependent children within the meaning of SDCL 26-8-6.[1] Dispositional hearings on August 21 and 28, 1987, resulted in the termination of mother's parental rights, pursuant to SDCL 26-8-35.2. Mother and children appeal from the trial court's disposition.
Mother raises the following issues on appeal: (1) Whether the admission of certain testimony by a pediatrician was reversible error; (2) whether the trial court erred in finding the children dependent and neglected; *523 and (3) whether the trial court erred in terminating mother's parental rights.
Children raise the following issues: (1) Whether termination of mother's parental rights was the least restrictive alternative; and (2) whether termination was in the best interests of the children. We first address the issues pertaining to the adjudicatory phase of the proceedings.
Mother first contends that the trial court erred in admitting testimony of the pediatrician who examined the children. She argues that the trial court impermissibly admitted testimony of the pediatrician who examined the children when they were removed from the home. The testimony mother is particularly concerned about involves a conversation between S.W. and the pediatrician, which, in summary, discloses:
That S.W. had attempted on numerous occasions to run away;
That men who came to her mother's house were very mean;
That one of these men had kicked the boys on their back, legs and buttocks;
That two years previously one of the men mother allowed in the home had attempted to sexually molest R.B.;
That two of mother's friends had been physically abusive toward the children; and
That one of the young men had been physically abusive toward mother.
Mother's counsel objected to the testimony as not going to diagnosis or treatment, as being hearsay and therefore not relevant.
The objection was overruled, but without explanation.
The trial court was not in error. Such testimony is admissible under settled law. United States v. Iron Shell, 633 F.2d 77 (8th Cir.1980); State v. Bawdon, 386 N.W.2d 484 (S.D.1986); People in Interest of M.W., 374 N.W.2d 889 (S.D.1985); State v. Garza, 337 N.W.2d 823 (S.D.1983); Matter of S.J.Z., 252 N.W.2d 224 (S.D.1977); SDCL 19-16-8. The statements complained of here were made to a pediatrician during a general physical exam. Pediatricians are trained to identify child abuse. In cases such as this, where statements made by the child to a pediatrician during an examination are related to some form of child abuse, the trial court is given fair leeway in admitting such evidence. The statements made here were primarily concerned with "what kind of things happen at home" rather than "who does what". Therefore, the trial court did not err in admitting testimony of the pediatrician as going to her diagnosis and treatment. SDCL 19-16-8; Bawdon, supra.
Mother next contends that the trial court erred in finding the children dependent within the meaning of SDCL 26-8-6.[2] The correct standard of proof at the adjudicatory stage of dependency and neglect proceedings is the "clear and convincing *524 evidence" standard, Santosky v. Kramer, 455 U.S. 745, 747-48, 102 S.Ct. 1388, 1391-92, 71 L.Ed.2d 599, 603 (1982); People in Interest of L.A., 334 N.W.2d 62, 64 (S.D. 1983), with "clear and convincing evidence" being that evidence that is so clear, direct, weighty, and convincing as to allow the trier of fact to reach clear conviction of precise facts at issue, without hesitancy as to their truth. Matter of S.H., 337 N.W.2d 179, 180 (S.D.1983); L.A., supra.
The trial court's findings of fact and conclusions of law at the adjudicatory stage state:
V.
The children lack proper parental care through the actions or omissions of the parent, [mother]; the children have been subjected to an environment injurious to their welfare; the parent, [mother] has failed or refused to provide proper or necessary subsistence, education or medical care or any other care necessary for their health, guidance or well-being.
VII.
... [A] pediatrician testified as to her exam of and interviews of these children
A) She found that the children had a significantly high number of bruises and scars for children of that age,
B) She testified as to the children's statements, especially [S.W.'s], that the adults in the home kicked, slapped and bit them.
C) [S.W.] told [pediatrician] that she slept with a baseball bat for protection.
D) [Pediatrician's] diagnosis of these children was suspected child abuse.
VIII.
The children's teachers ... described lack of academic advancement, lack of hygiene, hunger and tiredness [at] school.
A) [Teacher] noted [B.S.'s] regression after Christmas 1986.
IX.
The foster mother, ... described how [J.B.] and [M.B.] had regressed....
X.
[Mother's] brother, testified as to the number of young males in the home, the concern he had for the children because of the inconsistency of discipline and turmoil in the home.
XI.
The Department of Social Services' workers testified the same problems have continued since the Department of Social Services' involvement ended in November 1986.
A) [Mother] cannot control the abusive males in the home.
B) [Mother] cannot keep these individuals from physically harming the children.
C) [Mother] is unable to set realistic limits for her children, i.e. allowing her 13 year old daughter and her 15 year old boyfriend to spend the night together in the same room unsupervised. The mother admitted she felt this arrangement was appropriate because her 13 year old needs to have friends over some time.
D) [Mother] blatantly violated the curfew the Department of Social Services' worker established for the male friends to be out of the home by 4:00 p.m.
XII.
[Mother] admitted that the men in her home hit the children. She also admitted to a number of males coming in and out of her home.
CONCLUSIONS OF LAW
II.
[S.W., J.B., M.B., B.B., and R.B.] are dependent children within the meaning of SDCL 26-8-6.

*525 III.
The State has proven its case by clear and convincing evidence.
On appeal, we must ascertain whether the trial court was clearly erroneous in finding that the evidence supporting the finding of dependency was clear and convincing. In the Matter of J.Z., 423 N.W.2d 813 (S.D.1988); Matter of A.H., 421 N.W.2d 71 (S.D.1988); People in Interest of K.C., 414 N.W.2d 616 (S.D.1987); SDCL 15-6-52(a).
In applying this standard, the question before this court is not whether we would have made the same findings the trial court did; rather, the question is whether, after a review of all the evidence, we are convinced that a mistake has been made. (Citation omitted.)
K.C., 414 at 620.
The evidence in the record is quite clear. Mother consistently put her own needs above those of her children. She permitted a number of adult males in her home and allowed these men to discipline her children by kicking, slapping, burning and biting them. This environment was injurious to their welfare as evidenced by the number of bruises and scars on the children. Mother failed or refused to provide proper and necessary subsistence, education or medical care. She did not provide even minimal parenting for the children and failed to provide appropriate discipline. From our careful review of the record, we hold that the trial court did not err in finding the children were dependent within the meaning of SDCL 26-8-6.
After determining that the trial court did not err in finding the children dependent, we now turn to the issues raised by mother and children concerning the disposition of the trial court. Appellants contend that the trial court erred in terminating mother's parental rights.
The trial court's dispositional findings of fact state that based on clear and convincing evidence, the children are dependent and neglected, that mother could not provide a stable environment for the children, that the State Department of Social Services (DSS) has provided services to mother for over two years, that these services were reasonable efforts to prevent or eliminate the need for removal of the children and to make it possible for them to remain in the home.
The findings further stated that further services would be unavailing; that there is little likelihood that the deficiencies in the home would be remedied; and that it is contrary to the best interests of the children to return to mother's care. The least restrictive alternative commensurate with the children's best interests requires termination of mother's parental rights.
As we discussed regarding the adjudicatory proceeding, we again must ascertain whether the trial court's disposition was clearly erroneous in finding that the evidence supporting termination was clear and convincing. As in the discussion regarding the adjudicatory stage, the trial court's findings will not be set aside unless, after reviewing the evidence, we are left with a firm and definite conviction that a mistake has been made. We do not find that the trial court was clearly erroneous in determining that termination was the least restrictive alternative.
The record discloses a history of parenting problems. This history was properly before the trial court and before this court for review, with respect to the dispositional stage. L.A., supra at 65. Mother and her six minor children first came to the attention of DSS in September 1984. Referrals indicated that mother was feeding her children candy bars for supper, that the children were running around nude, and that they were not adequately supervised. From September 1984 through February 1985, DSS worked with mother on nutrition, meal planning, finding adequate housing, medical transportation, budgeting, and clothing for the children.
Again, on May 17, 1985, DSS received more referrals involving the family. One referral indicated that J.B. had been sexually abused. Another referral indicated that the children were being neglected in the home. DSS substantiated physical and sexual abuse as well as neglect and filed a *526 dependent and neglected petition on June 21, 1985, pursuant to SDCL 26-8-35.1. The six children were removed from mother's home on June 21, 1985. When the children were removed they had head lice, numerous bruises, burns, and scratches. On that occasion, mother stipulated that the children were dependent and neglected and adjudication was entered. DSS implemented a case service plan with mother. DSS provided intensive services to mother to rehabilitate and reunite the family. These services included: (1) counseling for mother's suicide threats; (2) family services; (3) vocational rehabilitation; (4) parenting classes; (5) budgeting; (6) assertiveness training; and (7) self-esteem enhancement.
After ten more months of these intensive services, mother showed some improvement and DSS made the decision to begin to return the children to mother's home. T.W. and S.W. were returned to mother's care on April 2, 1986. B.B. and R.B. were returned June 11, 1986. M.B. and J.B. were returned on July 18, 1986. DSS provided follow-up services for an additional six months until November 21, 1986. The agency had worked continuously with the family for eighteen months and in that time it tried to provide mother with the tools, community resources, and support system necessary to provide for her children.
SDCL 26-8-35.2 provides:
... [I]f the child has been in the legal custody of the department of social services for eighteen months, and it appears that all reasonable efforts have been made to rehabilitate the family, that the conditions which led to the removal of the child still exist, and there is little likelihood that those conditions will be remedied so that the child can be returned to the parents, the court shall affirmatively find that good cause exists for termination and shall enter an order terminating parental rights.... (Emphasis added.)
The purpose of this statute is to prevent a child from being perpetually kept in foster care and to see that some type of permanent situation is provided for the child. People in Interest of J.S.N., 371 N.W.2d 361 (S.D.1985). Pursuant to SDCL 26-8-35.2, a minor child can only be held in potential custodial transition for a maximum of eighteen months. People in Interest of D.M., 367 N.W.2d 769 (S.D.1985); People in Interest of M.S.M., 320 N.W.2d 795 (S.D.1982). Pursuant to SDCL 26-8-35.2, the trial court was forced to return legal custody of the children to mother.
After the court system was no longer involved, DSS offered mother additional voluntary services. Mother adamantly refused continued services. When the children were first returned to mother's care, she seemed capable of providing good care to her children. However, as soon as DSS stopped monitoring the home in November, 1986, mother's improved parenting skills quickly deteriorated. A month after DSS discontinued monitoring the family, they began to again receive referrals which culminated in this proceeding. One referral involved burns to J.B. The children's teachers began reporting changes taking place with the children and their home environment. On January 5, 1987, DSS again began working with mother to prevent removal of the children. By February 23, 1987, DSS had substantial evidence that mother was neglecting the five youngest children in spite of DSS's involvement. The children all had numerous bruises and scars. M.B. had been burned and had glass in a foot, J.B. had cigarette burns on his chest and a large bite on his leg. S.W. had untreated and infected boils. DSS removed the five youngest children and filed a dependency petition to terminate parental rights on February 25, 1987. Investigation regarding the oldest child (T.W.), who was in her early teens, indicated no sign of physical abuse as was the case with the younger children and DSS determined that action should not be taken in her case. As illustrated, the record is replete with competent evidence warranting a clear and convincing finding that the children were dependent and neglected and warranting the termination of mother's parental rights over S.W., J.B., M.B., B.B. and R.B.
*527 Children also contend that the trial court erred in terminating mother's parental rights; in essence, that termination was not the least restrictive alternative. Again, we note that we will not set aside findings unless we find them clearly erroneous. Mother and children argue that if mother had been given continued DSS services and parenting classes, she would have eventually been able to handle her children.
State only has a duty to provide reasonable services. SDCL 26-8-35.2 "Termination of parental rights is not conditioned on exhaustion of every possible form of assistance." People in Interest of C.L., 356 N.W.2d 476, 478 (S.D.1984). In other words, State does not have a duty to provide parenting classes until a parent is capable of parenthood. Rather, an eighteen-month period is given for this purpose and is limited to that time. SDCL 26-8-35.2.
In this case, DSS provided extensive services to mother for nearly two years. DSS services included family support worker, parenting classes, transportation, referral to budgeting classes, personal hygiene and basic living skill classes, personal counseling, vocational rehabilitation, and several community help programs. It was blatantly obvious to the trial court that further services offered to mother would have been to no avail. Parental rights can be terminated upon a showing that the services to the family are unavailing. People in Interest of S.M.M., 349 N.W.2d 63 (S.D.1984); M.S.M., supra; In re R.Z.F., 284 N.W.2d 879 (S.D.1979). Based on the facts enumerated above, we find that clear and convincing evidence supports the trial court's determination to terminate parental rights. When all attempts and assistance fail, no narrower alternative exists. Termination of parental rights in this case was the least restrictive alternative. In re N.J.W., 273 N.W.2d 134 (S.D.1978).
The children next contend that the trial court's disposition was not in their best interests. Children's counsel would separate the siblings, returning to mother only those siblings most easily managed and keeping the more difficult to manage in long-term foster care while at the same time providing extensive long-term services to mother. We point out that "the child's best interest" is viewed from the child's point of view, not that of the parents, and the prime concern of the court is that of the child. C.L., supra; R.Z.F., supra.
Children need certainty and stability. J.S.N., supra. Obviously, there can be no stability or certainty while children remain in foster care. Foster care leaves children to wonder if there ever will be a time when all the siblings and parents will be together, or if the time will come when they will have to be moved again. Additionally, there is no stability or certainty with mother. Mother has been given ample opportunity to change. Because services failed to remedy the situation, no change was foreseeable. From the children's point of view, termination of mother's parental rights was in their best interests.
State contends that termination of mother's parental rights and placement of four siblings in an adoptive home is in the children's best interest. (R.B. is to be placed with her birth father.) We agree. Long-term foster care is not an appropriate solution for children. The very purpose of SDCL 26-8-35.2 was to prevent children from growing up in foster care. Foster parents are not permanently committed to children the way adoptive parents are. Moreover, when a child turns eighteen, a foster child loses any family support system he or she had while in foster care.
The legislature has recognized that children need a permanent place to live. Since the record reflects that adoption of this sibling group is possible, we agree with the trial court's decision that termination of mother's parental rights is in the best interests of these children.
The troublesome problem in this issue is addressed by State's brief. The psychologist testified that the ideal solution would be to terminate mother's parental rights and place the children in an adoptive home where they could have contact with mother. However, an adoption specialist testified that continued visits with mother after *528 adoptive placement would be of little benefit to the children. To make a healthy adjustment, these children need to put some closure to their relationship with mother before adoptive placement. If contact with mother were to be maintained after adoptive placement, this shadow presence of the birth mother would only jeopardize the adoptive placement and keep the children from making a complete commitment to new parents. The psychologist conceded that the children do have the coping skills necessary to adjust if there were to be no further contact. We agree with the adoption specialist in this case.
We affirm the trial court.
WUEST, C.J., and HENDERSON and MILLER, JJ., concur.
SABERS, J., deeming himself disqualified, did not participate in this decision.
NOTES
[1] Mother's oldest child, T.W. (dob 8/17/73), is not involved in this proceeding.
[2] SDCL 26-8-6 provides:

In this chapter unless the context otherwise plainly requires "neglected or dependent child" means a child:
(1) Whose parent, guardian, or custodian has abandoned him or has subjected him to mistreatment or abuse;
(2) Who lacks proper parental care through the actions or omissions of the parent, guardian, or custodian;
(3) Whose environment is injurious to his welfare;
(4) Whose parent, guardian, or custodian fails or refuses to provide proper or necessary subsistence, education, medical care or any other care necessary for his health, guidance, or well-being;
(5) Who is homeless, without proper care, or not domiciled with his parent, guardian, or custodian through no fault of his parent, guardian or custodian;
(6) Who is threatened with substantial harm;
(7) Who has sustained emotional harm or mental injury as indicated by an injury to his intellectual or psychological capacity evidenced by an observable and substantial impairment in his ability to function within his normal range of performance and behavior, with due regard to his culture; or
(8) Who is subject to sexual abuse, sexual molestation or sexual exploitation by his parent, guardian, custodian or any other person responsible for his care.
Provided however, notwithstanding any other provision of this chapter, no child who in good faith is under treatment solely by spiritual means through prayer in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof shall, for that reason alone, be considered to have been neglected within the purview of this chapter.