The **PEOPLE** of the State of South Dakota in the Interest of E.M., A.M., and J.M., **Children, and Concerning their Parents, M.M., W.B.M., E.R.F.C., and R.D.W.H., Appellants.**

No. 16996.

Supreme Court of South Dakota.

Considered on Briefs Oct. 24, 1990.

Decided Feb. 20, 1991.

Mark L. Bratt, Asst. Atty. Gen., Pierre, for appellee, State of S.D.; Roger A. Tellinghuisen, Atty. Gen., on brief.

John K. Nooney of Morrill Brown & Thomas, Rapid City, for appellant mother, M.M.

MORGAN, Retired Justice.

This appeal arises from a dispositional order entered in a dependency and neglect action involving three children: E.M., A.M. and J.M.; their mother: M.M.; and their respective fathers: E.R.F.C., W.B.M. and R.D.W.H. By separate orders the parental rights of E.M.'s and J.M.'s fathers were terminated (they failed to appear and participate in any manner) and the proceedings as to A.M.'s father were dismissed and A.M.'s custody was restored to him. M.M.

(mother) appeals from the final dispositional order terminating her parental rights as to her minor children, E.M., A.M., and J.M. We affirm.

The parents and children are all American Indians. The birth dates of the children are: J.M., female, born on May 21, 1986 (father R.D.W.H.); E.M., female, born thirteen weeks prematurely on April 25, 1988 (father E.R.F.C.); and A.M., male, born nine weeks prematurely on January 14, 1989 (father W.B.M.). The Department of Social Services (Department) first came in contact with mother in 1987 in an effort to assist her in developing adequate parenting skills to care for her first child, J.M. Department terminated its intervention efforts after approximately six weeks due to mother's lack of cooperation.

Following E.M.'s premature birth in April 1988, E.M. remained hospitalized for approximately four months. In August 1988, E.M. was discharged. Because she was so premature, her lungs had not fully developed and she had bronchopulmonary dysplasia, a disability of the lungs, a condition which could improve, but which could also lead to death. Her condition required that she be nebulized four times a day, with a machine placed over her nose and mouth so that she could receive medicine into her lungs to help her breathe. Lee Ann Nelson (Nelson), a registered nurse working for Rapid City Regional Hospital's Home Health Care Services, was assigned to E.M.'s case. Nelson went to the family's home and instructed mother how to administer medications and taught her basic care for respiratory distress, diarrhea, fever, and ear infections. Nelson also showed mother how to feed, burp, and appropriately dress E.M., and how to play games to foster proper childhood development.

Nelson perceived that mother could not comprehend a lot of information at one time and, in order to retain what she learned, mother needed frequent repetitions of the information over a long period of time. For this reason, Nelson instructed mother by demonstration, by giving her pictures depicting proper care, and by frequent repetitions of information. Nelson and Doctor Kovarik, a neonatologist, both informed mother of the necessity of keeping doctor appointments, both to evaluate the child's progress and to monitor some of the drugs being administered. Notwithstanding Nelson's active instruction, however, mother failed to keep half the doctor appointments. E.M. was hospitalized at least eight times between her discharge from the hospital in August, 1988, and May, 1989. Home Health's involvement was discontinued in December, 1989, when mother moved to Eagle Butte. Mother failed to contact the Indian Health Service in Eagle Butte for medical services or to replenish the depleted supply of medicine for E.M. The child was hospitalized again in Eagle Butte on December 27, 1989, and transferred to Rapid City Regional Hospital the next day.

Mother returned to Rapid City and A.M. was born on January 14, 1989, about nine weeks prematurely, necessitating his stay in the hospital until February 21, 1989. In early January 1989, before A.M.'s birth, Department again became involved with mother. Initially, Department's primary concern was that E.M. was not receiving essential follow-up medical care, resulting in excessive hospitalization. The arrival of A.M. somewhat complicated the problem. He was a small weight baby upon his release from the hospital. He had a tendency to be sleepy and needed to be awakened, cuddled and nurtured. W.B.M., his father, often took care of A.M. and the home health care nurse appropriately taught him the proper care of an infant.

Mother expressed a dislike for Rapid City Regional Hospital's home health services and wanted Sioux San to provide them. They, however, declined because they could not provide the daily contact needed. Rapid City Regional was again involved. A social worker and a parent aide were also assigned to the family and provided additional services. Although no specific case plan was established, Department attempted to maintain regular contact with mother to ensure that she was meeting the special needs of E.M. and A.M., to ensure that she was keeping the medical

appointments for E.M., and to assist mother in development of her parenting skills.

After a few months, mother had developed a pattern of missing appointments with Department workers and argued that she did not need help. In addition, Department received several referrals on the family alleging that mother was neglecting the three children. On May 19, 1989, Department sought, and was awarded, temporary custody of E.M. On May 20, 1989, A.M. was brought to the emergency room by his father and was diagnosed as having H-flu meningitis, a contagious condition. On occasions Mother told the social workers that she was uncomfortable with A.M. because he is a boy, and that she preferred her daughters E.M. and J.M. because she could dress them up in dresses. Mother was also very immature and inappropriate in her interaction with the children.

A petition for dependency and neglect was filed in June, 1989, and the court granted Department temporary custody of the children on June 19, 1989. At that time, a third worker was assigned to the family to assist mother in accomplishing tasks set up by Department, such as parenting classes, establishing regular visitation between mother and children, and submitting to a psychological evaluation. Mother only attended approximately one-half of the scheduled visits with the children and ended most of those early. Although mother attributed her poor attendance record to transportation problems, she refused transportation assistance offered by Department. Also, Mother lived at approximately nine different residences between January and June, 1989. She did not inform Department of any of her moves and often she and the children could not be located for extended periods of time.

On August 7, 1989, the trial court held an adjudicatory hearing, entering its adjudicatory findings of fact and conclusions of law, and an adjudicatory order on September 21, 1989, nunc pro tunc August 7, 1989. The court found that mother had consistently failed to provide proper medical care and physical care for the three children. The court specifically found that mother had established "a pattern of lack of concern and recognition of the extraordinary needs of [E.M. and A.M.], and a lack of concern for a child with special needs such as [J.M.]." Accordingly, the children were adjudicated dependent and neglected.

Psychological evaluations of mother were conducted on July 28 and September 12, 1989, to determine her capacity to effectively parent. Mother's overall intellectual functioning was in the low average range. The psychologists noted that her verbal ability bordered on the mentally retarded range, but her performance ability was in the average range. These facts indicated that mother could learn by demonstration, but it was unlikely that she could learn through verbal commands.

A dispositional hearing was held on October 18, 1989. The court heard testimony from five professionals involved in the case, and from mother. In its dispositional findings of fact and conclusions of law, the trial court found that since the adjudicatory hearing mother had shown no interest in providing a home for the children, had failed to maintain regular visitation with the children, and had continued to be unwilling to cooperate with Department's efforts to provide remedial and rehabilitative services. Additional findings will be discussed in conjunction with the issues. The court filed its dispositional order on November 21, 1989, terminating mother's parental rights and granting Department authority to place the children up for adoption without the consent of, or notice to, mother.[1] Mother appeals.

Mother raises two issues on appeal:

1. Was the trial court's finding that Department made reasonable efforts to reunite the family clearly erroneous because it failed to apply the proper burden of proof?

2. Did the trial court err in concluding that termination of parental rights was the least restrictive alternative?

---

1. As previously noted, the parental rights of E.M.'s and J.M.'s fathers were also terminated in the same proceeding, but by separate orders, and custody of A.M. was restored to his father.

When reviewing an order terminating parental rights, we must determine whether the disposition of the trial court was clearly erroneous in finding that the evidence supporting termination was clear and convincing. *In re S.W.*, 428 N.W.2d 521, 525 (S.D.1988). "[T]he question before this court is not whether it would have made the same findings the trial court did, but whether the entire evidence leaves a definite and firm conviction that a mistake has been committed." *In re D.H.*, 354 N.W.2d 185, 188 (S.D.1984) (citations omitted). In termination cases, the State must prove that there is no narrower means of providing for the best interests and welfare of the child, and the trial court must find by clear and convincing evidence that termination of parental rights is in the best interests of the child. *In re J.Z.*, 410 N.W.2d 572, 574 (S.D.1987) *rev'd on other grounds* 423 N.W.2d 813 (S.D.1988).

In her first issue, Mother argues that the trial court failed to apply the proper burden of proof in determining whether Department's efforts to provide her assistance were sufficient under the circumstances. It is undisputed that the children are of Indian blood and, thus, the provisions of the Indian Child Welfare Act (Act), 25 U.S.C.A. Ch. 21, apply.[2] Mother claims that the trial court did not make its finding that reasonable efforts were made to provide services based on evidence beyond a reasonable doubt. The Act states:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

25 U.S.C.A. § 1912(d). No burden of proof is specified in the Act, however, in *In re S.R.*, 323 N.W.2d 885, 887 (S.D.1982), we determined that the same burden required to prove serious emotional or physical harm under § 1912(f), beyond a reasonable doubt, would be applicable. Mother contends that the trial court did not apply the reasonable doubt standard to determine whether the State had made active efforts through remedial services and rehabilitative programs to prevent the breakup of this Indian family.

Mother's argument is based on the fact that the trial court stated in two of its conclusions of law that its conclusions were based on proof beyond a reasonable doubt. However, the court's conclusion regarding reasonable efforts is as follows:

### IV.

> The Department of Social Services has made reasonable efforts to reunite the family by providing remedial services and rehabilitative programs designed to prevent the breakup of the Indian family insofar as it was possible under the circumstances and these efforts have proven unsuccessful.

Mother argues that the absence in this conclusion of a reference to the reasonable doubt standard establishes that the trial court did not apply this standard to its findings.

Mother does not direct the court to any authority to support her argument. In *In re J.J.*, 454 N.W.2d 317, 323 (S.D.1990), we addressed the sufficiency of evidence in a case involving the Act. In that case, the trial court had referred to both the reasonable doubt standard and the clear and convincing standard. We noted that the factual determinations made it apparent that the proper reasonable doubt standard had in fact been applied by the trial court. *Id.*

Here, we need not go that far because it is apparent from the other conclusions made by the trial court that the court was evaluating the evidence under the proper standard of review, beyond a reasonable doubt. The fact that the trial court did not expressly include the "beyond a reasonable doubt" language in one of its conclusions does not establish a definite and firm conviction that the proper standard was not applied. Because the trial court did indicate in other conclusions that the standard

---

**2.** Mother does not challenge compliance with the Act in any other respect.

of proof it applied was in fact the reasonable doubt standard, its decision in this regard is affirmed.

■ Although not related to the standard of review, mother also challenges the sufficiency of the evidence to establish that the State has made active efforts to provide remedial and rehabilitative services and that these services have failed. She contends that the fact that Department set up only one parenting class for her after the June, 1989, adjudicatory hearing, when the children were removed, and that Department acknowledged that their affiliated agencies can provide parenting classes tailored to parents with learning limitations but did not offer these services to her, establishes that active efforts were not made. Mother emphasizes that Department did not receive the psychologist's report substantiating her intellectual limitations until September or October.

■ We recognize that this is not a case where Department spent years providing services to assist the family as we have seen in some other cases. There is no prerequisite of time that must elapse between Department's first contact with the family and termination proceedings. *See, e.g., In re S.D.,* 402 N.W.2d 346 (S.D.1987). The length of time that elapses between Department's first contact with the family and termination proceedings is but one of the factors that may be considered. Each case must be evaluated individually. We have recognized, on the one hand, that compelling circumstances may require termination without delay. *In re M.S.M.,* 320 N.W.2d 795, 799 (S.D.1982) (seven months). But, on the other hand, we have held that termination of parental rights based on neglect which occurred in a one-month period was unwarranted. *In re B.E.,* 287 N.W.2d 91, 97 (S.D.1979) (termination of father's parental rights reversed).

The trial court entered the following crucial findings of fact:

## XII.

That there has been and continues to be an utter lack of cooperation on the part of the respondent mother's [sic].

## XIII.

That extensive services and efforts have been made by the Department of Social Services; however, the respondent mother is unwilling to take advantage of these efforts.

## XIV.

These efforts have been made by the Department of Social Services to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and such efforts have proven unsuccessful.

## XV.

Visitations between the respondent mother and the minor child have continued to be set up by the Department of Social Services; however, the respondent mother either missed the visitations or failed to follow-through with setting up further visitations with the minor children.

## XVI.

The respondent mother for the last three months has not shown any interest whatsoever in providing a home for the minor children, therefore, the Court does not believe that the respondent mother went to Cherry Creek to find a home for the children allegedly causing her to miss the last three visitations with the minor children.

. . . .

## XVIII.

The respondent mother has failed to maintain doctor's appointments and to get medical prescriptions for the minor children which were necessary for the minor children's health and welfare.

. . . .

## XX.

The respondent mother has moved often and has failed to let the Department

of Social Services know where she is moving to and where she is residing.

## XXI.

The respondent mother has failed to follow-through with parenting classes and techniques offered by the Department of Social Services; has failed to follow-through with visitations with the minor children; has failed to follow-through with the Case Service Plans entered into by the Department of Social Services; has failed to attend counseling appointments for herself and medical appointments for her children; has failed to meet the medical needs of the minor children; and the respondent mother has failed to maintain and provide a proper and stable home for the minor children.

## XXII.

That all of the failures on the part of the respondent mother to provide care for the minor children and the mother's lack of follow-through is [sic] not because of any psychological problems or intellectual incapabilities of the respondent mother but because of a lack of interest by the respondent mother in the welfare of her children.

In terminating mother's parental rights to the children, the court specifically concluded as follows:

## IV.

The Department of Social Services has made reasonable efforts to reunite the family by providing remedial services and rehabilitative programs designed to prevent the breakup of the Indian family insofar as it was possible under the circumstances and these efforts have proven unsuccessful.

## V.

Beyond a reasonable doubt it is necessary for the minor children's physical and mental well-being that the respondent mother, [M.M.]'s, parental rights be and hereby are terminated.

## VI.

Beyond a reasonable doubt there is no lesser restrictive alternative than termination of parental rights to protect the minor children from serious emotional and physical harm.

In this case, Department provided parenting education, psychological evaluations, counseling, community support services, visitation coordination, and home health care services from 1987 until November, 1989. The record establishes mother's history of lack of cooperation with these services. In fact, she argued that they were not necessary. She now argues that only one more service would have solved the problem. In *S.D., supra,* we said: "Past actions of parents speak louder than do their promises to improve in the future." 402 N.W.2d at 352. Nor is Department required to exhaust all available services or to provide assistance until mother is capable of adequately caring for her children. *S.W.,* 428 N.W.2d at 527. One factor which mother ignores is the fact that two of her children were at risk due to serious health problems. E.M. was in and out of hospitals constantly because of the care she afforded her while the Department was trying to assist her. Department was aware of mother's learning problems and parenting instructions were provided in a manner that took those problems into consideration. Thus, the fact that her learning problems were not substantiated by the psychologists until September or October 1989, does not alter the analysis. The trial court found that mother's lack of concern and cooperation were not a result of her psychological or intellectual status, but a result of her lack of genuine interest for the welfare of her children. There is ample evidence in the record to support this finding. In fact, as a whole, the record supports, beyond a reasonable doubt, the trial court's conclusion that the evidence established that Department made reasonable efforts to prevent the breakup of this family by providing remedial and rehabilitative services appropriate under the circumstances, and that these efforts were unsuccessful.

We then view the second issue wherein mother contends that termination of her parental rights was not the least restrictive alternative in the best interest of the children. She again argues that Department failed to provide her the proper training given her inability to learn verbally and that, if given appropriate training, she would have become a good mother. She also points to the short time frame involved here to argue that Department did not explore all available options before terminating her parental rights.

The law regarding this matter is settled. The least restrictive alternative must be viewed from the child's point of view, not from the parent's. *In re T.H.*, 396 N.W.2d 145, 148 (S.D.1986). The primary concern of the court is, and must always be, the best interests of the child. *In re A.H.*, 421 N.W.2d 71, 76 (S.D.1988). Children have a right to a stable and healthy environment, and should not be required to wait for their parents to acquire parenting skills that may never develop. *In re A.D.*, 416 N.W.2d 264, 268 (S.D. 1987). "A termination proceeding is preventative as well as remedial." *B.E.*, 287 N.W.2d at 95 (citation omitted). In fact, compelling circumstances may mandate termination of parental rights without delay. *M.S.M.*, 320 N.W.2d at 799. "If, on a review of the record, it appears that the state's compelling interest in the well-being and welfare of the children can reasonably be insured by less intrusive means, we must order that those alternatives first be implemented." *B.E.*, 287 N.W.2d at 95.

In reviewing the record here, we are not left with a definite and firm conviction that a mistake has been made. *See D.H.*, 354 N.W.2d at 188. Both E.M. and A.M. were born prematurely and had special needs which mother consistently failed to meet. Mother demonstrated a lack of concern over the serious nature of their medical needs. Department provided mother with the services of a parent aide and a social worker, and offered to assist mother in arranging for housing and transportation. Mother did not avail herself of the agency's assistance. Mother argues that because of her lack of understanding of verbal commands Department wrongly perceived her as a quitter. Both a psychologist and a social worker testified that mother's lack of motivation existed independent of her learning limitations. The trial court specifically found that mother's failure to provide care and follow through with parenting was because mother lacked interest in the welfare of her children, and "not because of any psychological problems or intellectual incapabilities." We agree.

Mother also argues that the services provided by Nelson, the Home Health Services nurse, should not have been considered in determining whether Department provided adequate training to her to prevent the breakup of the family. Mother appears to argue that since Nelson began assisting her in August, 1988, before Department became involved in January, 1989, that Nelson's efforts should be disregarded. However, Nelson employed precisely the methods of instruction, demonstration techniques and repetition of instructions over a long period of time that mother contends were necessary, given her limitations. Mother also claims that because Department only offered her one parenting class (which she attended), and did not offer her classes specifically tailored to her learning limitations, Department failed to utilize less restrictive alternatives. This argument has been discussed under the sufficiency of evidence argument above and the analysis therein is equally applicable here.

Mother's unwillingness to avail herself of assistance that was specifically tailored to her needs is precisely the type of evidence which should be considered in determining whether termination is appropriate. Termination of parental rights is justified where attempts to assist the parent in providing better care for the child are unsuccessful. *In re S.A.H.*, 314 N.W.2d 316, 317 (S.D.1982). All efforts to assist mother in adequately caring for the children were unsuccessful. Department is not required to exhaust all possible services. *In re C.L.*, 356 N.W.2d 476, 478 (S.D. 1984). From the children's point of view,

termination of mother's parental rights was the least restrictive alternative.

We are not unmindful of the magnitude of the termination of mother's parental rights, or of mother's own intellectual limitations. However, the record establishes that mother was uncooperative and unconcerned, notwithstanding her limitations. State's compelling interest in the welfare of these children mandates that they be removed from mother's neglectful control to protect them from serious danger and permanent harm. *See S.R.*, 323 N.W.2d at 888–89; *B.E.*, 287 N.W.2d at 95.

We affirm the decision of the trial court.

MILLER, C.J., and WUEST and SABERS, JJ., concur.

HENDERSON, J., dissents.

HERTZ, Circuit Judge, acting as a Supreme Court Justice, not having been a member of the Court at the time this case was considered, did not participate.

HENDERSON, Justice (dissenting).

I respectfully dissent.

DSS acknowledged at the dispositional hearing that its method of providing parental training to this Indian mother was flawed, given her limitations. It cannot elevate itself above its own testimony by crafty appellate advocacy. *Swier v. Norwest Bank*, 409 N.W.2d 121 (S.D.1987); 30 Am.Jur.2d Evidence § 1087 (1967); Annot. 169 A.L.R. 799 (1947).

Given her intellectual limitations, Mother should have had services provided to her because of these intellectual limitations and which would concentrate on her limitations. DSS failed to offer these services to the mother. In fact, DSS was not made privy to the limitations of the mother until late September, 1989, which was only two weeks prior to the dispositional hearing. Therefore, 25 U.S.C. § 1912(d) was violated. When DSS learned of this, it should have stopped—based upon new facts—and helped this mother.

A psychologist opined that mother had the ability to be a good parent if she were given the proper parenting training. He further opined that the training of this mother could not be accomplished through traditional teaching, but, rather, necessitated individual training through demonstration and modeling parenting techniques. He further testified this training could be accomplished within six months. However, DSS absolutely refused to give her this training.

In my opinion, the Indian Child Welfare Act absolutely commands that more than one parenting class (which she attended) be offered to this Indian mother; yet, this was the only parenting class ever offered by DSS occurred *after* filing the dependent and neglect action, which class occurred shortly prior to the dispositional hearing. ICWA requires that a court be satisfied "that active efforts have been made to provide remedial services and rehabilitative programs in an effort to prevent the breakup of an Indian family." 25 U.S.C. § 1912(d).

DSS' excuse, although it acknowledges that it did not take active efforts to help this young Indian mother (given her limitations), is that they perceived her "to be uncooperative." Thus, it incorrectly circumvents the Indian Child Welfare Act.

Reviewing this evidence, I am left with a definite and firm conviction that a mistake has been committed by the trial court. *Matter of S.D.*, 402 N.W.2d 346, 351 (S.D. 1987).

The DSS miserably failed to help provide this mother with the necessary skills to parent her children. Its entire purpose—its entire involvement—was supposedly to provide this mother with services which would result in the return of her children. DSS has caused the breakup of this Indian family and the termination of her parental rights was not the least restrictive alternative.

A termination of the mother's rights was not the least restrictive alternative because, inter alia, DSS acknowledged it had the resources available to provide training to an individual such as this Indian mother. The evidence, in this case, does not establish *beyond a reasonable doubt* that the

standards of ICWA have been satisfied. *People in Interest of S.R.*, 323 N.W.2d 885, 887 (S.D.1982).

This decision violates our holding in *People in the Interest of J.J.*, 454 N.W.2d 317, 325 (S.D.1990) requiring remedial services and rehabilitative programs to determine if the requirements of the Indian Child Welfare Act have been met.

Therefore, as this Indian mother was absolutely denied an opportunity to acquire skills and be provided with teaching, consistent with her known disabilities, which surfaced two weeks before the dispositional hearing, I must respectfully dissent. Our decision is against congressional goals. ICWA "was enacted for the benefit of Indians [and] must be liberally construed with all doubts resolved in favor of Indians." *See, Matter of L.A.M.*, 727 P.2d 1057, 1060 (Alaska 1986).

## CAVEAT

"Nature never rhymes her children, nor makes two men alike." Ralph Waldo Emerson. In this world, we are not all born white and bright. Some of us are born as redmen; some border on the mentally retarded range; yet, have performance ability in the average mental range which is the exact situation with this Indian mother. When does the Law, with human perspective, recognize the biological difference in the human species and adjudicate in justice, accordingly? Why can we not recognize that all human beings are equal in the eyes of God, and equal in the eyes of the Law, but we are not equal in ability?