654 N.W.2d 786 (2002)
2002 SD 144
In Interest of J.L., Minor Child.
No. 22227.
Supreme Court of South Dakota.
Considered on Briefs October 3, 2002.
Decided November 26, 2002.
*787 Elizabeth Rosenbaum, Sioux City, Iowa, Attorney for intervenors and appellants W.S. and S.S.
Linda Kogel, Vermillion, South Dakota, Attorney for appellee mother.
Phil Peterson, Beresford, South Dakota, Guardian Ad Litem, Attorney for J.L.
PER CURIAM.
[¶ 1.] Intervenors W.S. and S.S. (foster parents) appeal a circuit court order transferring jurisdiction over this child abuse and neglect case to the Tribal Court of the Standing Rock Sioux Tribe of North and South Dakota. We affirm.

FACTS
[¶ 2.] J.L., the child at issue, was born on August 31, 2000. J.L. and his parents are Native American and J.L. and M.S., mother, are enrolled members of the Standing Rock Sioux Tribe.
*788 [¶ 3.] In March 2001, mother was residing in Lantry, South Dakota on the Cheyenne River Sioux Reservation. On March 12, she contacted Catholic Family Services asking to place J.L. for adoption. Mother advised that she could not care for J.L. physically or emotionally and that she wanted an immediate placement for the child. On March 15, Catholic Family Services accepted J.L. into foster care and, on March 22, placed him in the physical custody of W.S. and S.S. of Vermillion as a pre-adoptive placement. W.S. and S.S. have been married over seven years and are licensed foster parents. S.S. is a kindergarten teacher and W.S. is a professor in the School of Education at the University of South Dakota.
[¶ 4.] On May 5, 2001, mother contacted Catholic Family Services saying that she wanted her son back.[1] Mother continued to have contact with Catholic Family Services and arranged to pick J.L. up in Vermillion on Friday, May 25. However, that same day, the South Dakota Department of Social Services (DSS) received information concerning mother's care of J.L.'s three-year-old sister. Allegations were made that mother had placed the child in the physical custody of an aunt, that she had been abused while in the aunt's care and that she had suffered a broken nose and two black eyes. It was further alleged that mother had retrieved the child from the aunt's custody without obtaining any medical treatment for her.
[¶ 5.] On receipt of this information, DSS took emergency custody of J.L. Thus, mother was unable to meet with anyone from DSS or with foster parents or J.L. during her visit to Vermillion on May 25. A temporary custody hearing was held on Tuesday, May 29. Mother and H.L, father, participated by telephone. After the hearing, the circuit court entered an order granting temporary custody of J.L. to DSS and continuing his physical custody with foster parents. On May 30, the State filed a petition alleging J.L. to be an abused and neglected child. The first appearance on the petition was scheduled for July 27 and the Standing Rock Sioux Tribe was notified of the hearing.
[¶ 6.] After the May 29 hearing, DSS arranged for a social worker from Pierre to meet with mother and father and to conduct a home study. The study was completed in the middle of June and services were recommended. However, DSS had difficulty maintaining contact with mother between June 25 and the end of August. On August 31, mother contacted DSS to advise that she was going to have the tribe intervene in the matter. Due to mother's sporadic contact, the first appearance scheduled for July was rescheduled for August and, again, for November. In the interim, petitions to intervene were filed by the Standing Rock Sioux Tribe and by foster parents. The tribe also filed a petition to transfer jurisdiction over the case from circuit court to the Standing Rock Sioux Tribal Court pursuant to the ICWA.
[¶ 7.] The first appearance on the petition was held on November 9, 2001. A DSS report to the court at that time indicated that mother was living with her grandfather on the Standing Rock Reservation in Kenel, South Dakota and that she was on a waiting list for a two bedroom apartment that might be available by the end of the month. The report also indicated that father was no longer living with mother. The report recommended that *789 mother complete parenting classes, alcohol and drug evaluations, a mental health evaluation and that she find appropriate housing. At the close of the hearing, the circuit court granted the motions to intervene filed by the tribe and by foster parents. After the hearing, mother had her first visit with J.L. since May and a DSS worker later described the visit as "very appropriate."
[¶ 8.] The hearing on the tribe's petition to transfer jurisdiction was held on December 7, 2001. On December 13, the circuit court entered a detailed memorandum decision granting the motion to transfer. The memorandum instructed that, on receipt of a written confirmation from the tribal court that it would accept jurisdiction, the case would be transferred to the tribal court for further proceedings. A confirmation of the tribe's acceptance of jurisdiction was filed on December 19 and the circuit court entered its formal order transferring jurisdiction on December 20. According to foster parents' brief, it was also on December 19 that J.L. was removed from their home and placed directly into mother's care. This appeal followed.

ISSUE

[¶ 9.] Did the circuit court err in transferring jurisdiction to the tribal court?
[¶ 10.] Foster parents argue that the circuit court erred in transferring jurisdiction of this matter to the Standing Rock Sioux Tribal Court. The standards for consideration of this issue have been outlined as follows:
25 USC § 1911(a) of ICWA sets forth the jurisdictional framework for child custody proceedings and grants a tribe exclusive jurisdiction if: 1) the child is a ward of the tribal court, regardless of where the child resides or is domiciled; 2) the child resides within the reservation of his or her tribe; or 3) the child is domiciled within the reservation. Where § 1911(a) does not apply, 25 USC § 1911(b) affords states and tribes concurrent but presumably tribal jurisdiction over child custody proceedings. In enacting the jurisdictional provisions of ICWA, "Congress intended that as a general principle, Indian tribes should have authority to determine custody issues involving Indian children." In re Adoption of Halloway, 732 P.2d 962, 968 (Utah 1986).
People in Interest of G.R.F., 1997 SD 112, ¶ 14, 569 N.W.2d 29, 32 (emphasis added).
[¶ 11.] Here, the circuit court determined that 25 USC § 1911(a) does not apply and resolved the transfer of jurisdiction issue under the requirements of 25 USC § 1911(b). This determination is not questioned on appeal.
[¶ 12.] This Court has outlined the following analysis for transfer of jurisdiction issues under § 1911(b):
25 USC § 1911(b) (1989) provides in part:
In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe[.] (emphasis added.)
"[T]ransfer to the jurisdiction of the tribe is mandatory in the absence of good cause to the contrary." Chester Cnty. Dept. of Social Servs. v. Coleman, 296 S.C. 355, 372 S.E.2d 912, 914 (Ct. App.1988).

*790 Federal guidelines interpreting the Act define "good cause to the contrary" as including, but not limited to cases where (1) the proceeding is at an advanced stage when the petition to transfer is received and the petition is not promptly filed after receipt of notice; (2) the Indian child is over the age of twelve and objects to the transfer; (3) evidence necessary to decide the case cannot be adequately presented to the tribal court without undue hardship to witnesses and parties; (4) the parents of an Indian child over the age of five are not available and the child has had little or no contact with the child's tribe or members of the child's tribe.... Case law also suggests that "good cause to the contrary" includes the absence of a tribal mechanism for handling child custody matters. The burden of establishing good cause to the contrary is on the party opposing transfer. The third element of the guidelines has been applied to deny transfer due to considerations of forum non conveniens, such as availability of witnesses and access to proof.

Coleman, 372 S.E.2d at 914-15 (citations omitted). See also State ex rel. J.J., 454 N.W.2d 317, 328-331 (S.D.1990).
People in Interests of M.C., 504 N.W.2d 598, 601 (S.D.1993).
[¶ 13.] This Court further held in M.C., supra, that a child is entitled to an evidentiary hearing to establish good cause not to transfer jurisdiction to the tribe. Id. The Court also held that the record must reflect that the trial court considered the various factors constituting good cause not to transfer jurisdiction and that it should make specific findings on all of the factors outlined above. Id at 601-602.
[¶ 14.] Although the circuit court did not enter formal findings and conclusions on the transfer issue in this case, such a failure is not necessarily fatal where the record leaves no doubt as to the basis of the court's decision. See e.g., State v. Hartley, 326 N.W.2d 226, 228 (S.D.1982)(whether findings and conclusions are formally entered or orally made on the record, they must be such that there is no room for speculation and conjecture concerning what the trial court found or concluded).[2] Here, the circuit court entered an extremely detailed seventeen page memorandum decision methodically analyzing each of the factors constituting good cause not to transfer jurisdiction under § 1911(b). There is no doubt as to the basis of the court's decision.
[¶ 15.] With regard to the applicable factors, the circuit court found that the following favored a transfer of jurisdiction: 1) that although the tribe did not file a petition promptly after receiving notice of this case, the proceedings were not at an advanced stage when the petition was filed; 2) J.L. is not over twelve years of age so that guideline has no application; 3) J.L. is less than five years of age and his mother is available so that guideline has no application; 4) the Standing Rock Sioux Tribe in North and South Dakota does have a tribal court that could entertain this action.
[¶ 16.] The only factor that the circuit court found would support a denial of a transfer of jurisdiction was the "forum non conveniens factor." This requires consideration of whether the evidence necessary to decide the case can be adequately presented to the tribal court without *791 undue hardship to witnesses and parties. In that regard, the circuit court found:
[J.L.] has never resided on the Standing Rock Reservation. There are no witnesses whose testimony would be relevant at the adjudicatory stage (other than Mother) on the Standing Rock Reservation. All of the witnesses to the abuse & neglect allegations would either be on the Cheyenne River Reservation or in Vermillion. For the dispositional phase, witnesses as to mother's current situation and her efforts to establish a home where [J.L.] would be appropriately cared for would be on the Standing Rock Reservation. Witnesses as to [J.L.'s] current situation and what is necessary and appropriate for him would mostly be in Vermillion.
The Tribal Court in Ft. Yates, North Dakota is a long way[] from Vermillion; the witnesses who are familiar with [J.L.'s] life during the past six months would be required to leave South Dakota and go to North Dakota to participate in any further proceedings. This evidence could not be adequately presented to the Tribal Court without undue hardship to the parties and the witnesses. This guideline is in favor of this Court retaining jurisdiction.
[¶ 17.] Even this finding, however, is inconclusive. It concedes that witnesses will either have to travel from Vermillion to the tribal court or from locations on the Standing Rock and Cheyenne River Reservations to Vermillion and that one side or the other will be inconvenienced and face hardship in these proceedings. Thus, contrary to the circuit court's conclusion, this is, at best, a neutral factor in evaluating the tribe's petition to transfer jurisdiction. Under the settled law that § 1911(b) affords the tribes concurrent "but presumably tribal jurisdiction" in cases of this nature, a neutral factor provides no basis for denial of a tribe's petition for a transfer of jurisdiction.
[¶ 18.] Based upon the applicable factors discussed above, the circuit court did not err in its ultimate determination granting the tribe's petition to transfer jurisdiction. Foster parents argue that the overall best interests of the child override the foregoing factors. In that vein, they argue that the circuit court's finding that it would be in J.L.'s best interests to remain with them provided adequate good cause to deny the petition to transfer jurisdiction.
[¶ 19.] There is authority for foster parents' argument. In Matter of Adoption of T.R.M., 525 N.E.2d 298, 307 (Ind.1988), the Indiana Supreme Court made the following observations as to the factor of the best interests of the child in a transfer request:
Section 1902 of the ICWA provides in part "that it is the policy of this Nation to protect the best interests of Indian children ...." The Montana Supreme Court, while considering the above-mentioned guidelines in determining the issue of good cause, has also considered the "best interests of the child," and has concluded that transfer may be defeated by a "clear and convincing showing" by the State. In re M.E.M. (1981), 195 Mont. 329, 336, 635 P.2d 1313, 1317. We agree that the best interests of the child are a valid consideration in determining the issue of good cause under § 1911(b).
[¶ 20.] Here, despite its ultimate holding that jurisdiction over this case should be transferred to the tribal court, the circuit court did enter the following findings determining that it would be in J.L.'s best interest to remain with foster parents:
The evidence shows that [foster parents] are good people who truly care for [J.L.] and have done whatever they could to improve his life. They have provided a good home, good medical care, and the *792 love and affection that [J.L.] needed. [J.L.] has bonded with them and will suffer psychologically if he is removed. This Court believes that if [J.L.] was left with them, they would continue to provide this care and he would have many opportunities that otherwise will not be available to him. It would be in [J.L.'s] best interests to remain with [foster parents].
[¶ 21.] There is no dispute whatsoever over the capability of foster parents and the good care that they provided J.L. However, that a substitute parent might provide a child with good care or even better care than its natural parent is not an appropriate standard for determining the best interests of a child. As this Court said in Matter of B.E., 287 N.W.2d 91, 97 (S.D.1979), "State intervention for the best interest of the child cannot be used merely to insure that the child has a better home or someone better to care for it."
[¶ 22.] The circuit court's findings regarding J.L.'s bonding with foster parents and the potential for psychological damage on his removal from their care do raise legitimate concerns over his best interests. Unfortunately, these concerns are present in every abuse and neglect case where a child is entrusted to foster care as the extended legal process necessary to protect the rights of all parties unfolds. Moreover, we cannot ignore the reality at this juncture that J.L. was removed from foster parents' care on entry of the circuit court's transfer order and has now been back in the care of his own mother for approximately nine months. Presumably, uprooting him from her care and transferring him back to foster parents at this point would also have some psychological effect on the child.
[¶ 23.] Another important consideration in evaluating the best interests of the child in this particular case is the point at which we find ourselves in the abuse and neglect process. Well over a year after DSS's first intervention, there has yet to be any adjudication of abuse or neglect of J.L.[3] Were we to reverse the circuit court's transfer order, it would be necessary for that court to reacquire legal and personal jurisdiction over J.L. and to conduct an adjudicatory hearing. Based upon the record before us, we question whether an adjudication of abuse and neglect could be sustained. The DSS worker who testified at the transfer hearing conceded that the allegations under which DSS originally intervened in this case were not true, i.e., the abuse of J.L.'s older sister by his aunt. Thus, we perceive no grounds to sustain an adjudication. Even if an adjudication could be sustained, DSS would be required to make active efforts to work with mother to prevent the breakup of the family. People in Interest of B.S., 1997 SD 86, ¶ 11, 566 N.W.2d 446, 448 (citing People in Interest of A.R.P., 519 N.W.2d 56, 60 (S.D.1994)(quoting 25 USC § 1912(d))). Only on the failure of these efforts could matters proceed to a disposition terminating mother's parental rights and to a possible permanent placement of the child with foster parents. Id. It is not difficult to envision these steps adding further instability to J.L.'s young life for an even more extended period time. Further instability and delay are clearly not in J.L.'s best interests. See Matter of R.P., 498 N.W.2d 364, 368 (S.D.1993)(best interests of child require that some certitude and stability enter child's life.)
[¶ 24.] For these reasons, we hold that J.L's best interests are better served by *793 affirming the circuit court's transfer order and by permitting the appropriate tribal authorities to continue to fulfill their responsibility to act on J.L.'s behalf and to protect his best interests.
[¶ 25.] Affirmed.
[¶ 26.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP and ZINTER, Justices, and AMUNDSON, Retired Justice, participating.
[¶ 27.] MEIERHENRY, Justice, not having been a member of the Court at the time this was submitted to the Court, did not participate.
NOTES
[1] Section 1913(c) of the Indian Child Welfare Act (ICWA) permits a parent to withdraw consent for adoption of a child at any time prior to entry of a final decree of adoption. 25 USC § 1913(c).
[2] Nevertheless, we reiterate our preference for the entry of formal written findings of fact and conclusions of law whenever they are required.
[3] While we recognize mother's partial fault in this delay, it does not change the status of the case.