2005 SD 125
THE PEOPLE OF THE STATE OF SOUTH DAKOTA IN THE INTEREST OF T.I. AND T.I., Minor Children, AND CONCERNING C.I. AND D.B., Respondents, and
SISSETON-WAHPETON SIOUX TRIBE AND YANKTON SIOUX TRIBE, Intervenors.
Nos. 23581, 23587, 23597
Supreme Court of South Dakota.
Considered on Briefs on November 7, 2005
Opinion Filed December 21, 2005
CHRISTY GRIFFIN SERR, Aberdeen, South Dakota, Attorney for appellant Mother C.I.
WILLIAM D. GERDES, Aberdeen, South Dakota, Attorney for appellant Father D.B.
KELLY MARNETTE, Aberdeen, South Dakota, Attorney for appellee Minor Children.
LAWRENCE E. LONG, Attorney General, ANN M. HOLZHAUSER, Assistant Attorney General, Pierre, South Dakota, Attorneys for appellee State of South Dakota.
KONENKAMP, Justice
[¶1.] In this abuse and neglect proceeding, governed by the provisions of the Indian Child Welfare Act (ICWA), the circuit court declined transfer of jurisdiction to tribal court and terminated the mother and father's parental rights. We affirm.

Background
[¶2.] The mother and father are the biological parents of T.I. (Son 1), born August 18, 1997, and T.I. (Son 2), born March 2, 1999. At the commencement of these proceedings, Son 1 was a member of the Yankton Sioux Tribe (YST) and Son 2 was eligible for enrollment in YST. Also, both children were eligible for enrollment, but were not actually enrolled, in the Sisseton-Wahpeton Sioux Tribe (SWST).
[¶3.] The state filed two abuse and neglect petitions against the mother and father regarding these children. This appeal concerns the second petition, but the facts surrounding the first are relevant. On February 15, 2002, Son 2, then age two, was spotted walking alone on Main Street in Aberdeen at 10:15 p.m. When law enforcement officers found him, he had no coat and had only slippers on his feet. The mother was questioned and stated that she had an apartment, but no electricity, food, or furniture. She also disclosed her use of alcohol. The Department of Social Services (DSS) substantiated its concerns and the first petition alleging abuse and neglect was filed. The children were placed in protective custody and were later placed with the paternal grandmother in Waubay in March 2002.
[¶4.] The parents denied the allegations of abuse and neglect and an adjudicatory hearing was set for June 2002. YST and SWST were given notice and SWST petitioned to transfer in May 2002. The adjudication was continued to October, but at the June hearing the mother opposed transfer to SWST. She requested that her children be removed from the grandmother's home, claiming alcohol was being used excessively there. Transfer to SWST was denied and the children were returned to foster care with DSS. The adjudicatory hearing concerning this first petition was held on October 9, 2002, and the circuit court declined to find the children abused and neglected. The first petition was dismissed and the children were returned to the mother and father.
[¶5.] The remaining factual and procedural background pertains to the second petition and the resulting appeal. DSS became involved again in September 2003, after it had received "reports of domestic violence, lack of food, and excessive alcohol consumption in the home." The allegations were confirmed by the mother, who indicated that there "had been prior incidents of severe domestic violence by [the] father towards her [and] she had obtained a protection order against him in tribal court." She also claimed that the father drank frequently. Particularly significant was the report from Son 1, then age six, that there had been a physical altercation between the mother and father after they had been drinking and that there was "blood all over." This violent dispute between the parents occurred at a motel and was described by Son 1, who said that the mother wanted to go to the doctor, but the father would not let her. At the time of this altercation, the parents were not living together. Instead, the mother had been living with her boyfriend (A.S.), who also drank with the mother, as Son 1 described, "every night."
[¶6.] As a result, DSS placed the children in protective custody, filed a second abuse and neglect petition, and gave notice to both YST and SWST. On September 23, 2003, the mother regained physical, but not legal, custody of both children. DSS, however, was concerned because of the mother's "history of moving and failing to follow-through with services, her conduct in exposing the children to excessive alcohol and domestic violence, her back and forth relationship between [the] father and A.S., and her lack of financial stability." Thus, her continued custody of the children depended on the mother following prescribed conditions.[1]
[¶7.] She worked with home based services, as required, and she also received her chemical dependency evaluation. She was recommended for outpatient treatment. But the mother violated the requirement that she not leave Brown County, when she took the children to Sisseton and reconciled with the father.[2] Nevertheless, the court allowed the mother and father to have continued custody of the children and DSS worked with the mother to develop a new case service plan to include both parents. Specifically, the mother and father "were asked to work with NEMHC Homebased services, obtain psychological evaluations, get drug and alcohol evaluations and follow the recommendations." In addition, the father was required to take anger management classes.
[¶8.] An adjudicatory hearing for the second petition was held on January 27, 2004. Both parents admitted the allegations and the children were adjudicated abused and neglected. The parents retained physical custody of the children and agreed to work on their case plan. During the next couple of months, DSS documented the following: the mother began her outpatient treatment, but it was not working and she was referred to inpatient treatment; Son 1 claimed that the mother and father left him and his brother alone at times; the mother was not employed; the mother was not going to AA, but the father was attending; the mother claimed that the father was drinking and wanted him out of the home. Eventually, the mother wanted the father to move back home, so in early April 2004 a meeting was held to establish another case service plan in order for the father to return home.[3] In addition to the new plan, DSS actively worked with the mother and father. Specifically, "DSS made referrals to NADRIC for alcohol evaluations, assisted the family in paying for gas and rent, provided transportation, and worked with NEMHC in looking for funding to get the father medication for his depression and anger." However, both the mother and father "exhibited limited cooperation in completing the listed tasks."[4]
[¶9.] In April 2004, the mother and father were threatened with eviction "due to concerns regarding the living conditions of their apartment." When the mother contacted DSS for money, she was told she could stay at a women's shelter and keep her children. Instead, the mother and father, without permission, moved with the children to Lake Andes. At a hearing on April 28, 2004, the mother "asked the court to allow her and the children to remain in Lake Andes with the promise that she and the father would work with the Lake Andes area DSS office and comply with the prior nine item agreement." Even though they had violated the court order prohibiting them from leaving Brown County, the court and DSS agreed to work with the mother and father on the condition that they remain in contact with the local DSS office and meet their established agreements under the case plan.
[¶10.] Initially, the parents contacted the YST ICWA director, Ray Cournoyer, and requested services, but none were available. He told them to contact the Lake Andes DSS; however, they did not do so until May 27, 2004. Essentially, DSS was unaware of their whereabouts in Lake Andes from April 26 to May 28, 2004. DSS was finally able to locate the mother when a worker drove by a residence of the mother's relative and noticed several boys playing in the yard and stopped to inquire and the mother came out to introduce herself. While talking with the DSS worker, the mother expressed concern because "she did not know how long the relative's food would last." DSS responded by offering the mother various services and by bringing the family food. In addition, the mother and father were directed to continue to work toward their agreed service plans and to maintain contact with the local DSS office. They did neither.
[¶11.] At a review hearing on June 2, 2004, both failed to appear. And they had failed to maintain contact with their attorneys. As a result, the court held the mother in contempt, issued a warrant for her arrest, and ordered physical custody of the children be returned to DSS. However, DSS could not locate the mother and father. It was not until June 24, 2004, that DSS learned the parents had left Lake Andes for Oregon taking the children with them. When law enforcement officers and local social service workers were notified in Oregon, the children were placed in temporary custody until a South Dakota DSS worker flew to Oregon and brought the children back to South Dakota. The parents did not return to South Dakota. At a review hearing in July 2004, the circuit court relayed to the mother that she needed to return if she wanted to participate in the proceedings. At this same hearing, both YST and SWST sought to transfer the case to their respective tribes.
[¶12.] Based on the tribes' requests, a transfer hearing was held on August 13, 2004. SWST appeared through Evelyn Pilcher, a non-attorney ICWA representative for SWST, with thirteen years experience. Ray Cournoyer, a non-attorney ICWA representative for YST, with two years experience, appeared on behalf of YST. At the hearing, YST withdrew its previous request for transfer in order to permit the case to be transferred to SWST. For its part, SWST sought transfer because it claimed that both children were eligible for enrollment.[5] But, because Son 1 was already an enrolled member of YST, his eligibility for enrollment in SWST did not give SWST jurisdiction over Son 1.[6] In addition to this jurisdictional problem, the court also considered the timeliness of SWST's request, finding it to be at the advanced stage of these proceedings. Consequently, the court denied the request for transfer to SWST finding good cause to the contrary. Nonetheless, the court placed the children in temporary physical custody with their aunt, A.I., on the SWST reservation.
[¶13.] In the meantime, the mother and father returned from Oregon, and DSS continued in its attempt to provide services to them. When the mother was arrested for a probation violation, DSS arranged for visitation. Then when she was released from jail, DSS offered the mother further services, such as arrangements for another alcohol evaluation and a psychological evaluation. But the parents moved yet again, this time to North Dakota. DSS had encouraged the mother to "stay in South Dakota at the women's shelter in order to be reunited with her children quickly." However, she decided to move to Bismarck, North Dakota, to be with the father.
[¶14.] DSS continued to actively work with the mother and father by arranging to coordinate services through North Dakota. In response, the mother "represented that she had completed her alcohol assessment and would be attending outpatient treatment." The father informed DSS he was working with a United Tribal College social worker to make arrangements for anger management classes and that he was staying in a "no-drink" dorm. But when a review hearing was held on November 10, 2004 in South Dakota, neither the mother nor the father appeared. And the court explained that it was not DSS's duty to accommodate the parents after they moved away, but ordered DSS to make arrangements to facilitate at least one visit between the parents and the children. Thereafter, DSS offered the parents reimbursement for travel expenses and also purchased the parents a bus ticket they could use at their convenience. Neither parent accepted these offers, nor did they visit their children until shortly before the final dispositional hearing. Also, while they were in North Dakota, the local social service office reported that the parents were not working on any of their case plan goals.
[¶15.] The final dispositional hearing was held on February 3, 2005, and the circuit court terminated the parental rights of both parents. It concluded that the parents failed to avail themselves of the services offered; they made little significant progress toward completing the goals set by DSS and the court; and there was little likelihood that the conditions that existed at the time of the petition would be remedied. Thus, the court concluded "beyond a reasonable doubt" that the continued custody of the children with the mother and father would likely "result in serious emotional or physical damage to the minor children" and termination of their parental rights was the "least restrictive alternative available commensurate with the best interests of these minor children."
[¶16.] In their appeal, the parents' issues can be summarized as follows:
(1) Whether the trial court erred in denying transfer of jurisdiction to either the Yankton Sioux Tribe or the Sisseton-Wahpeton Sioux Tribe.
(2) Whether the trial court erred in finding that terminating the parents' parental rights was the least restrictive alternative available and that it was in the best interest of the children under SDCL 26-8A-26.
(3) Whether the trial court erred in finding beyond a reasonable doubt and through qualified expert testimony that continued custody of the minor children by the mother and father would result in serious emotional or physical damage to the minor children so that termination was appropriate under ICWA.
By notice of review, the children raise the following issue:
Whether the trial court erred in finding the parents have a right to refuse to testify at the final dispositional hearing.

Analysis and Decision

1. Transfer to Tribal Court
[¶17.] Before we discuss the merits of this question, we first address the proper burden of proof applicable to motions to transfer under ICWA. We have heretofore approved the abuse of discretion standard in deciding whether good cause existed not to transfer. This means that circuit courts have discretion whether to grant or deny these motions. Abuse of discretion is the most relaxed standard. Yet, absent good cause to the contrary, federal law creates presumptive tribal court jurisdiction in foster care placement and termination of parental rights proceedings. 25 USC § 1911(b). The burden of establishing good cause to deny a transfer is upon the party opposing the transfer. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed Reg 67.586, 67591 ¶C.3(d). If the presumption is in favor of tribal jurisdiction, then mere discretion to override an ICWA transfer is inconsistent with congressional intent. See In the Interest of D.M., 2004 SD 90, ¶36, 685 NW2d 768, 777 (Konenkamp, J., concurring specially). In enacting ICWA, Congress wanted to have Indian tribes determine custody issues involving Indian children. In re G.R.F., 1997 SD 112, ¶14, 569 NW2d 29, 32 (citation omitted). It is true that some other courts have used the abuse of discretion standard. However, the better reasoned decisions hold that the determination must be supported by clear and convincing evidence of good cause. In re A.P., 25 KanApp2d 268, 276, 961 P2d 706, 713 (1998) (clear and convincing standard); In re Adoption of S.W., 41 P3d 1003, 1013 (OklaCivApp 2001) (same); In re M.E.M., 195 Mont 329, 335, 635 P2d 1313, 1317 (1981). Considering the firm congressional intent behind ICWA, the standard most consistent with the Act requires clear and convincing evidence of good cause for a state court to refuse to transfer to tribal court. Today we amend the burden on the parties opposing these motions to clear and convincing, but this standard will have prospective application only.
[¶18.] In order for a transfer to proceed under ICWA, a tribe must be designated as the "Indian child's tribe" because an Indian child, even though eligible for enrollment in more than one tribe, can only have one tribe exercising jurisdiction for purposes of ICWA.[7]See 25 USC § 1903(5); see also Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed Reg 67.586, ¶B.2 (Commentary) (stating that "there obviously can be only one tribe to adjudicate the case"). Also, the federal guidelines interpreting ICWA state that if a "child is a member of only one tribe, that tribe shall be designated the Indian child's tribe even though the child is eligible for membership in another tribe." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed Reg 67.586, ¶B.2(e).
[¶19.] Once jurisdiction has been established, the issue of transfer of jurisdiction is controlled by 25 USC § 1911(b), which requires transfer of the case to a tribal court with jurisdiction "absence good cause to the contrary." See In re M.C., 504 NW2d 598, 600 (SD 1993). As we have said, the burden is on the party opposing transfer to prove good cause to the contrary. In re J.L., 2002 SD 144, ¶12, 654 NW2d 786, 790 (citation omitted). However, what circumstances constitute "good cause to the contrary" is not defined by ICWA. See id. Thus, we turn to the federal guidelines interpreting "good cause to the contrary" under ICWA, guidelines previously applied by this Court.[8]Id. (citing Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed Reg 67.586, ¶C.3(b)); see also In the Matter of J.C.D., 2004 SD 96, ¶11, 686 NW2d 647, 649.
[¶20.] The record reflects that YST moved to intervene on October 28, 2003, informing the court that Son 1 is an enrolled member of YST and that Son 2 is eligible for enrollment. YST continued to stay involved and on May 11, 2004, it moved to transfer jurisdiction. YST further informed the court on June 22, 2004, after a review hearing in tribal court, that YST accepted jurisdiction over both children. SWST, sent correspondence, received on March 5, 2004, stating that neither child was enrolled or eligible for enrollment in SWST. However, on July 13, 2004, after a question of paternity was resolved, SWST moved to transfer, now alleging that both children were eligible for enrollment in the tribe.
[¶21.] Because both the state and the children objected to transfer to either YST or SWST, a hearing was held on August 13, 2004. A representative from both YST and SWST appeared on behalf of their respective tribes, and YST withdrew its request for transfer, asking that jurisdiction be transferred to SWST. Accordingly, the circuit court considered the request, but denied transfer to SWST, finding good cause to the contrary.
[¶22.] Based on our review of the record, we conclude that SWST did not have jurisdiction over Son 1. The circuit court found that Son 1 is an enrolled member of YST and YST is the "Indian child's Tribe" as defined by ICWA. As a result, SWST, the only tribe requesting transfer, cannot exercise jurisdiction over Son 1. The judge concluded that the "only court that actually has jurisdiction by law over both children is the state court." This alone is good cause to deny transfer to SWST.[9] Moreover, the ICWA expert testified that these children should be kept together and not be separated. Thus, under either the abuse of discretion standard or the clear and convincing standard, the circuit court did not err when it denied transfer of jurisdiction to the SWST. Because YST voluntarily withdrew its request for transfer, we need not address its motion.

2. Reasonable Efforts under SDCL 26-8A-26
[¶23.] In order to terminate the mother and father's parental rights, SDCL 26-8A-26 requires that "all reasonable efforts have been made to rehabilitate the family, that the conditions which led to the removal of the child still exist, and there is little likelihood that those conditions will be remedied so the child can be returned to the custody of the child's parents. . . ." In addition, the circuit court must find that "`termination was the least restrictive alternative commensurate with the child's best interests. . . .'" In the Matter of A.S., 2000 SD 94, ¶19, 614 NW2d 383, 386 (quoting In re J.Y., 502 NW2d 860, 862 (SD 1993); In re A.H., 421 NW2d 71, 75 (SD 1988)).
[¶24.] The parents contend, first, that the conditions that existed at the time of removal do not still exist, and, second, that termination of their parental rights was not the least restrictive alternative. They maintain that the only "condition" that existed was a physical altercation the parents had while they were drinking and no evidence was presented indicating "the domestic violence or drinking has continued." While this was one reason for removing the children, the circuit court also considered the parents' persistent inability to provide for their children. Furthermore, the court considered conditions identified after the children were in the state's custody such as: "the parents moving from place to place, [and] not having jobs or a stable home. . . ."[10] The court incorporated a stipulated time line into its findings, demonstrating the parents' continuing failure to provide for the needs of their children. Even with assistance from DSS with rent, living expenses, and basic necessities such as food and clothing, the parents' inability to provide for their children persisted as they lived a transient lifestyle, repeatedly in violation of DSS recommendations and court orders.
[¶25.] The record supports the circuit court's finding that "reasonable efforts have been made to rehabilitate the family and to reunite the minor children" with their parents by DSS. It is undisputed that DSS worked with the mother and father even after they violated court orders. In sum, DSS has been working with and assisting this family since 2002. During this time, it was apparent to the circuit court that "there is little likelihood that these conditions will be remedied to allow the children to be returned to the custody of the children's parents." In particular, both parents failed to follow the recommendations of their chemical dependency evaluations; the mother failed to complete her psychological evaluation and abide by any recommendations; the father failed to attend or complete any anger management counseling; and both parents failed to visit their children regularly, keep in contact with DSS on a consistent basis, and follow the court's orders.
[¶26.] When "efforts to assist the parent through the use of social services proves unavailing, the trial court is justified in terminating parental rights." In re S.L.H., 342 NW2d 672, 677 (SD 1983) (citing In re S.S., 334 NW2d 59, 62 (SD 1983)). Accordingly, we see no error in the court's finding that the evidence supports the conclusion that the conditions that existed at the time of removal of the children still exist under SDCL 26-8A-26.
[¶27.] We next consider whether terminating parental rights was the least restrictive alternative. Based on the parents' lack of compliance and their inability to provide for their children, the circuit court found the parents unfit and that it was not in the best interests of the children that they return to their parents. The circuit court believed the conditions that still exist have little likelihood of being remedied. Thereafter, the court balanced the parents' fundamental right to raise their children against the best interests of the children and terminated the mother and father's parental rights. The court concluded this was the least restrictive alternative available.
[¶28.] The parents, however, ask this Court to allow a guardianship as a least restrictive alternative. After presenting this same argument below, the circuit court acknowledged the children's need for permanency. "[T]he well-being of the children overcomes the need to continue to offer services to parents that are unwilling to accept those services." Essentially, the court declined guardianship in this case because it
would prolong the impermanent situation and have the children essentially hanging out there for a long period of time wondering if their parents are ever going to be able to have them back again. I am convinced beyond a reasonable doubt with all of my findings and all of my conclusions that were we to give this case another year or another two years or another three years, that we would be exactly where we are today, that these children would not have their parents, and that their parents would not be able to provide them the level of care necessary.
[¶29.] We conclude that the evidence clearly and convincingly supports the finding that termination of parental rights was the least restrictive alternative under SDCL 26-8A-26.[11] Thus, the circuit court did not err when it found the conditions that existed at the time of removal still exist and that terminating the mother and father's parental rights was the least restrictive alternative commensurate with the best interests of the children.

3. Requirements under ICWA
[¶30.] Under 25 USC § 1912(f), before parental rights can be terminated ICWA requires qualified expert testimony to support the court's finding beyond a reasonable doubt that serious physical or emotional damage will likely result if continued custody remains with the parents.[12] (Emphasis added). Ray Cournoyer was offered as the state's sole ICWA expert. Defense counsel challenged him as an ICWA expert for SWST, but did not oppose his qualifications as an ICWA expert for YST. Therefore, the circuit court accepted Cournoyer as a qualified expert for YST's customs and childrearing practices.[13] After Cournoyer explained his qualifications, he testified that in his opinion the continued custody of these children with their parents would result in serious emotional damage. Based on this expert testimony and other facts presented throughout the termination hearing, the circuit court concluded beyond a reasonable doubt that the continued custody of the children with the parents would result in serious emotional damage to the children.
[¶31.] As a result, the parents claim, first, that the court erred because ICWA necessitates expert testimony on SWST's customs and childrearing practices, and second, that serious emotional damage was not proved beyond a reasonable doubt. The parents claim that expert testimony is qualified if it specifically pertains to SWST's childrearing practices and customs because SWST is Son 2's alleged tribe and an expert on the YST practices is insufficient. [14]See In the Interest of M.H., 2005 SD 4, ¶¶10-15, 691 NW2d 622, 625-27.
[¶32.] First, the trial court is always vested with the sound discretion to decide whether a witness meets the foundational requirements for testifying as an expert. This discretion will not be overturned unless we find an abuse of discretion. See id.; In the Interest of O.S., 2005 SD 86, ¶¶10-14, 701 NW2d 421, 425-26. Second, even if we accepted the parents' claim, qualified expert testimony existed in this case because the children's tribe is YST, not SWST, and the parents do not dispute that Cournoyer is a qualified expert on YST's customs and childrearing practices. The parents are alone in their claim that SWST is Son 2's tribe and the evidence in the record supports the court's finding that YST is the children's tribe.[15] While the children may be eligible for enrollment in SWST, we have never required a court to consider expert testimony concerning each tribe the child is eligible for enrollment with.[16]See Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed Reg 67.586, ¶D.4(b). The circuit court did not abuse its discretion when it qualified Cournoyer as an expert under 25 § USC 1912(f).
[¶33.] Because we find Cournoyer to be a qualified expert, we next consider the parents' claim that the evidence did not support the court's finding that "beyond a reasonable doubt, continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." See 25 USC § 1912(f). ICWA requires this threshold finding before parental rights can be terminated. See id.; In the Interest of D.G., 2004 SD 54, ¶18, 679 NW2d 497, 502. According to the parents, the evidence proved only a "`possibility that there could be' some emotional damage" and that is insufficient to sustain a finding beyond a reasonable doubt.
[¶34.] The circuit court considered the fact that the mother and father have "made no efforts to avail themselves of any substantial services throughout the entire process of this case [and] [t]here has been no significant accomplishment towards any of the goals that have been set throughout the proceedings by Social Services or the Court." Further, the court considered the testimony of the ICWA expert and others, and concluded that "there is little likelihood that any . . . continued efforts are going to make any change with this family, and I also buttress that with my experience dealing with the family throughout the proceedings of this particular case."[17]
[¶35.] The evidence for this issue is closely tied with the evidence to support termination as the least restrictive alternative under SDCL 26-8A-26. Thus, we hold that the court's findings support a conclusion beyond a reasonable doubt that continued custody of the children with the parents would likely result in serious emotional damage and termination was the least restrictive alternative commensurate with the children's best interests.

4. No Absolute Right to Refuse to Testify in Dispositional Hearings
[¶36.] The children and the state challenge the circuit court's decision that neither parent would be required to testify at the final dispositional hearing. After the children called the mother to testify, the court asked the mother's attorney if he discussed with her, her "right not to testify" and the attorney answered in the affirmative. The children's attorney argued that the parents do not have a right at a dispositional hearing not to testify, but the court disagreed and excused both parents from testifying. The state and the children objected, but the court did not identify a reason for allowing the parents this blanket right.
[¶37.] On appeal, the parents argue that they had the right to remain silent under the Fifth Amendment of the Federal Constitution and article VI, section 9 of the South Dakota Constitution. But the court denied any opportunity to inquire into areas that would be non-incriminating. While the issue is moot because we are affirming the circuit court's decision to terminate parental rights, we nevertheless choose to address it for the benefit of the bench and bar.
[¶38.] An abuse and neglect proceeding is civil in nature, not criminal or quasi-criminal. See In re C.J.H., 371 NW2d 345, 349 (SD 1985). Nevertheless, we recognize the privilege against self incrimination in civil proceedings. See State v. Sinnott, 72 SD 100, 105, 30 NW2d 455, 458 (1947) (article VI, section 9 of the South Dakota Constitution that grants the privilege against self incrimination, "is not confined to criminal actions, but extends to all manner of proceedings in which testimony is to be taken and protects both witnesses and parties") (citing State v. Smith, 56 SD 238, 228 NW 240 (1929)). In addition, the children and the state have the right to call the parents as witnesses and interrogate them until the privilege is invoked. See id. (stating that it is the plaintiff's right to call the defendant as a witness in a civil proceeding) (citation omitted). Because the circuit court's decision closed the door to information that may have been important in determining the final disposition of these children, we must consider whether a parent can flatly refuse to testify at a termination hearing, even concerning questions that are not incriminating.
[¶39.] We have not previously addressed this question; however, as the Eighth Circuit Court of Appeals explained, "[t]here is no blanket Fifth Amendment right to refuse to answer questions in noncriminal proceedings." Capitol Products Corp. v. Hernon, 457 F2d 541, 542 (8thCir 1972). Instead, a court should determine if the witness "is confronted by substantial and `real', and not merely trifling or imaginary, hazards of incrimination." Daly v. United States, 393 F2d 873, 878 (8thCir 1968) (quoting Marchetti v. United States, 390 US 39, 53, 88 SCt 697, 706, 19 LEd2d 889 (1968) (citing Rogers v. United States, 340 US 367, 374, 71 SCt 438, 442, 95 LEd 344 (1951); Brown v. Walker, 161 US 591, 600, 16 SCt 644, 648, 40 LEd 819 (US 1896))).
[¶40.] The circuit court's ruling giving the parents an absolute right against being examined in court could have excluded information that was in the sole possession of the parents. While there was ample evidence in the record to support the court's decision to terminate parental rights, the court should not have allowed the parents a blanket right not to testify. The children and the state have a valid interest in questioning the parents in order to inquire into matters that would not be incriminating and would not violate the parents' privilege against self incrimination.
[¶41.] Affirmed.
[¶42.] GILBERTSON, Chief Justice, and SABERS, ZINTER and MEIERHENRY, Justices, concur.
NOTES
[1] The conditions were: (1) report to the Brown County Sheriff each day and submit to a PBT, (2) cooperate with Northern Alcohol & Drug Referral & Information Center (NADRIC) and Northeastern Mental Health Center (NEMHC) Homebased services and follow their recommendations, (3) remain in Brown County unless given permission to leave by DSS, and (4) work with DSS to develop a case service plan and accomplish these goals set forth in the case service plan.
[2] The mother's boyfriend, A.S., informed law enforcement officers that "she had left him a note stating she was going to Sisseton to get Father. . . ."
[3] The mother's attorney wrote a list of nine items the parents agreed to in order for the father to return home. These items included: (1) Driver's License (Mother), (2) Insurance (Father), (3) Day Care Assistance (Mother, DSS caseworker), (4) Anger Management (Father, NEMHC, DSS caseworker, Bob Van Winkle), (5) Marriage Counseling, (6) Psychological  finish (Mother & Kent Miller), (7) Job (Mother), (8) AA (Mother, Father) signed cards, and (9) PBTs 2X daily (Father) 1X daily (Mother).
[4] "Mother did not obtain a driver's license. Father did not get insurance. Mother did not complete her psychological evaluation. Mother obtained employment, but only for a short time. Father did not complete anger management classes. Mother and Father went to counseling for a short period of time."
[5] There was some concern regarding the paternity of Son 2, but after the father was established as Son 2's biological father, SWST identified both children as eligible members of the tribe.
[6] Pilcher, on behalf of the SWST, acknowledged that Son 1 was enrolled in YST and that SWST had no jurisdiction over Son 1.
[7] The record reflects that both YST and SWST have an interest in these children, but "the fact that Congress, in the definition of `Indian child's tribe,' provided criterion for determining which is the Indian child's tribe, is a clear indication of legislative intent that there be only one such tribe for each child." See Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed Reg 67.586, ¶B.2 (Commentary).
[8] "Good cause to the contrary" may occur in cases when:

(1) the proceeding is at an advanced stage when the petition to transfer is received and the petition is not promptly filed after receipt of notice; (2) the Indian child is over the age of twelve and objects to the transfer; (3) evidence necessary to decide the case cannot be adequately presented to the tribal court without undue hardship to witnesses and parties; (4) the parents of an Indian child over the age of five are not available and the child has had little or no contact with the child's tribe or members of the child's tribe.
In re J.L., 2002 SD 144, ¶12, 654 NW2d at 790 (citing Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed Reg 67.586, ¶C.3(b)).
[9] The court also held that good cause existed to deny transfer because the proceedings were in an advanced stage, a factor recognized by the federal guidelines interpreting "good cause to the contrary." See In re J.L., 2002 SD 144, ¶12, 654 NW2d at 790 (citing Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed Reg 67.586, ¶C.3(b)). Under this rationale, the court noted that SWST was given notice of these proceedings, but waited until ten months after the abuse and neglect petition was filed to request a transfer. By this time both children were adjudicated abused and neglected and DSS had been involved extensively with the family working to provide services to the parents who continually failed to cooperate. Thus, the court concluded that "at this late stage in the proceedingsadvanced stage in the proceedings, it would not be appropriate to transfer jurisdiction to the tribal courts."
[10] The court specifically stated that "it is not accurate to say that the only basis for removal from the home was domestic abuse. The [s]tate alleged a number of different things in their petition."
[11] The court addressed the desire to have the children placed with an Indian family, as ICWA requires, and specifically directed DSS to "pursue the options of placing these children with a family member."
[12] Section 1912(f) provides:

No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. (Emphasis added).
[13] Ray Cournoyer has been a member of the YST since 1972 and has lived on the reservation for the last thirteen years. He has spent most of his life on the reservation, absent time in the military and while attending college, and is familiar with the custom and culture of the tribe. He is also aware of the services available through the YST regarding childrearing and parenting.
[14] During cross examination, Cournoyer was asked about his knowledge of SWST's customs and childrearing practices. He responded:

A: Well, I think that they'rethey belong to the Great Sioux Nation, and I think we all speak different dialects, but we allbut their customs and practices are pretty much the same all the way through Sioux Country. I think that there is probably a variation, not very much, but I think throughout Sioux Country they are allI mean whatever practices are on Yankton is pretty much what's up on Sisseton.
Q: But you are not aware of, for example, what services may be available through the Sisseton-Wahpeton Tribe; is that correct?
A: I talked with Evelyn [SWST, ICWA director], and I think all reservations have the same services as the State.
[15] Cournoyer testified that both children are members of YST. Also, a letter from the Chief Judge of SWST to the circuit court received one day before the final dispositional hearing states that "[i]n order for the children to be enrolled into our [Sisseton-Wahpeton Sioux] Tribe we must have confirmation of relinquishment from Yankton Sioux Tribe as you cannot be enrolled in two tribes simultaneously." (Emphasis added). This letter was written as a last minute request for a continuance. The circuit court addressed this request at the termination hearing and the decision to deny a continuance was not appealed.
[16] ICWA does not require testimony from an expert on each and every tribe the Indian child is eligible for enrollment in. Instead, the federal guidelines interpreting ICWA provide a list of characteristics that" are most likely to meet the requirements for a qualified expert witness of purposes of Indian child custody proceedings: (i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and child rearing practices. (ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe. (iii) A professional person having substantial education and experience in the area of his or her specialty."

See Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed Reg 67.586, ¶D.4(b) (emphasis added).
[17] Cournoyer, testifying as the ICWA expert, was asked:

Q: This point as of today, if this judge were to say that [the children are going to go and live with their parents] as of today, do you believe that that would likely result in serious emotional or physical damage?
A: I think it would because they haven't taken advantage of the services that were offered to them.
. . .
Q: Okay. If the parents have domestic abuse issues, anger issues and then don't address those properly with treatment as recommended by the Tribe, that could result also in serious emotional injury to the children, correct?
A: Yes. Because it shows up at school, and they have problems not only through school and other things, but it shows up throughout the community.
Q: Okay. If the parents have unresolved alcohol issues, would that have aa negative result on the children's emotional health?
A: Yes. In my own personal experience of observing, I say yes.