#24996-rev in pt & aff in pt-GAS

**2009 SD 52**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

The People of the State
of South Dakota in the Interest
of J.I.H. and J.I.H., Children
and Concerning,

M.D.,                                                          Respondent,

and

J.I.H.,                                                         Respondent and Appellant,

Cheyenne River Sioux Tribe,                          Intervenor.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE JANINE M. KERN
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

ANN M. HOLZHAUSER
Assistant Attorney General
Pierre, South Dakota                           Attorneys for appellee, State.

JEREMIAH J. DAVIS
Pennington County Public
 Defender's Office
Rapid City, South Dakota                     Attorneys for appellant, Father
                                                         J.I.H.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MAY 26, 2009

OPINION FILED **07/01/09**

#24996

SEVERSON, Justice.

[¶1.]    The trial court terminated Father's parental rights to his two children. He appeals. We reverse in part and affirm in part.

## FACTS

[¶2.]    This appeal concerns the termination of only Father's parental rights. Mother and Father are Cheyenne River Sioux Tribe (CRST) members, and have two children together. The children are eligible for enrollment in the tribe.

[¶3.]    On September 29, 2007, Son and Daughter, then ages fourteen months and thirty-two months, respectively, were removed from Mother's care after law enforcement officers responded to the home. Mother was intoxicated and the children were filthy. The home was also filthy and drug paraphernalia was present. Mother was arrested on several charges, and the children were placed in protective custody with the Department of Social Services (DSS). Father was incarcerated at the time. He was serving consecutive sentences for simple assault/domestic violence and escape, and was scheduled for release in December 2008. He remained incarcerated throughout the duration of the trial court proceedings.

[¶4.]    DSS was granted temporary custody of the children on October 1, 2007, and a petition alleging the children were abused and neglected was filed on October 5, 2007.[1] Mother later admitted to the petition, while Father denied it.

---

1.    Notice of the petition as well as additional notices throughout the proceedings were sent to the CRST. The tribe made an oral motion to intervene on October 30, 2007. However, as of May 6, 2008, the date of the final dispositional hearing, no motion to transfer the case to tribal court had been filed.

-1-

The children were initially placed in foster care. In mid-October 2007, they were placed with their maternal grandmother (Grandmother), and remained in her care until February 8, 2008, at which time Grandmother requested the children be removed because she was "overwhelmed." Grandmother was a registered nurse who worked nights, and, at the time, had two other grandchildren, as well as her youngest daughter who was pregnant, in her home. Son and Daughter were removed and remained in foster care for the balance of the proceedings.

[¶5.] An adjudicatory hearing concerning Father was held on January 16, 2008. Father admitted he was incarcerated at the time the children were taken into protective custody, thereby leaving the children without his care and supervision. The trial court adjudicated the children neglected pursuant to SDCL 26-8A-2 due to the actions and/or omissions of Father.

[¶6.] The final dispositional hearing was held on May 6, 2008. Only two witnesses testified: Sarah Trimble, the DSS family services specialist assigned to this family; and Luke Yellow Robe, who testified on behalf of the State as the Indian Child Welfare Act (ICWA) expert.

[¶7.] Trimble explained that at the inception of this case, the main safety concern with regard to Father was his inability to care for the children due to his incarceration. Trimble first met with Father in December 2007, but did not begin taking the children to visit Father in jail until February 2008 because until then they were placed with Grandmother. Trimble indicated that at the first visit the children did not know Father, and interaction between the children and Father was "very reserved." Overtime, however, the interaction increased from the children

playing by themselves with Father watching to Father actually playing and engaging with the children. Trimble testified that Father's interactions with the children were always appropriate during the visits.

[¶8.] Trimble testified that due to Father's incarceration, the services she could offer Father were limited. Moreover, the services that could be provided in the county jail were more limited than the services provided in the state penitentiary. In addition to arranging visitation, Trimble assisted Father with case planning and relative searches to facilitate a family placement. Father did not receive any sort of parenting instruction from DSS until March 17, 2008. Because Father was not going to be released from jail until December 2008 and several issues would need to be dealt with thereafter, Trimble testified it could possibly be an additional year or two before Father could be available to parent the children.

[¶9.] Trimble testified that Grandmother had reconsidered and showed interest in being a long-term placement for the children. Grandmother's sister in Washington also expressed interest as a placement option for the children. In addition, Grandmother's home study to be a foster care provider had been approved, and her final requirement to be a licensed foster care provider was completion of Pride classes.

[¶10.] Ultimately, Trimble recommended Father's parental rights be terminated, in an effort to provide permanency and stability in the children's lives. She testified that, in her opinion, "adoption with a relative would probably be [the children's] best opportunity to lead a normal, healthy life."

[¶11.] Yellow Robe, a member of the Sicagu Lakota Rosebud Sioux Tribe, also testified. He testified as the ICWA expert on behalf of the State. Yellow Robe is a private consultant who previously served for twelve years as the Cultural Relations Director for the Children's Home Society. Prior to that, he served as a law enforcement officer for eleven years. For nine of those years, he was a school liaison officer for a school with a student body composed of more than fifty percent Indians.

[¶12.] Yellow Robe testified to his knowledge of the CRST, including an explanation of the similarities and differences between the Rosebud Sioux Tribe and the CRST. He testified that the child-rearing practices between the two tribes were similar in nature. He further explained some of the resources available to parents on the CRST reservation.

[¶13.] Yellow Robe explained his familiarity with ICWA and identified its purpose and various requirements. He had previously been qualified to testify as an ICWA expert in 50 to 60 cases. When questioned by Father's counsel to specify the placement hierarchy for Indian children, Yellow Robe indicated that immediate family members were first priority, but admitted that he could not articulate the specific hierarchy set forth in the Act. With regard to counsel's question concerning the State's standard of proof under ICWA, Yellow Robe noted that the State was required to show that all efforts have been exhausted on behalf of the Indian family, but stated he was unable to quote specific language from the Act. Based on this testimony, counsel for Father and counsel for the children objected to Yellow Robe testifying as an ICWA expert. The trial court overruled the objection and allowed him to provide expert testimony.

[¶14.] Based on his review of the report to the trial court, the protective capacity assessments, and Trimble's testimony, Yellow Robe testified that the least restrictive alternative available and the children's best interests required termination of Father's parental rights. He initially testified that, in his opinion, DSS employed active efforts to reunite the children with their parents. However, on cross-examination, he admitted that failure to provide Father with visitation and parenting information for five months was not active efforts. Moreover, he stated that "about all [DSS] could do . . . was . . . abide by what the rules are at the jail. Visitations were provided to the father every week. And that was really about it for . . . the father of these children." In response to the question whether it was premature to terminate parental rights, he stated, "Not on mom, but maybe the father." He noted that further efforts could still be made to provide assistance to Father, especially in view of his recent progress.

[¶15.] Ruling from the bench, the trial court terminated both parents' rights. Father appeals this decision, as well as the court's decision to qualify Yellow Robe as an ICWA expert.

## ANALYSIS & DECISION

[¶16.] **1. Whether the trial court erred in finding beyond a reasonable doubt that termination of Father's parental rights was the least restrictive alternative and in the children's best interests.**

[¶17.] It is undisputed that ICWA applies in this case. The declared policy of ICWA is

> to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of

> Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

25 USCA 1902. In pertinent part, ICWA instructs that "[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 USCA 1912(f). This must be proven beyond a reasonable doubt. *Id.* ICWA additionally requires the State to show it made active efforts to prevent the breakup of the Indian family. In this regard, ICWA provides:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

25 USCA 1912(d). This Court has held that the standard of proving active efforts is similarly beyond a reasonable doubt. *In re* E.M., 466 NW2d 168, 172 (SD 1991) (citing *In re* S.R., 323 NW2d 885, 887 (SD 1982)).

[¶18.] In terminating Father's rights, the trial court found beyond a reasonable doubt that DSS "made reasonable and active efforts to provide remedial services designed to prevent the break-up of the Indian family and to reunite the children with the . . . parents" and that these efforts failed. The court agreed that parenting information should have been provided to Father sooner, but found that Father's "voluntary act of simple assault, and then of walking away from work release led to the incarceration that renders him unavailable to provide for the

mental, financial, emotional and spiritual well-being of his children." Ultimately, it found that "the least restrictive alternative available in the minor children's best interest is for the parents' rights to be terminated[.]"

[¶19.] On appeal, the trial court's findings are reviewed under a clearly erroneous standard of review. *In re* B.S., 1997 SD 86, ¶13, 566 NW2d 446, 449. "[T]he question before this [C]ourt is not whether it would have made the same findings the trial court did, but whether the entire evidence leaves a definite and firm conviction that a mistake has been committed." *In re* D.H., 354 NW2d 185, 188 (SD 1984) (citations omitted).

[¶20.] Father contends the trial court erred in finding that the State met its burden of proving DSS employed active efforts and that these efforts failed. His argument is premised on the belief that termination of his rights was premature. Father's supervised visitation began February 25, 2008. A mere twenty-one days later on March 17, 2008, the State requested a final dispositional hearing. The dispositional hearing was held on May 6, 2008. Between February 25 and May 6, Father had, at most, eleven one-hour visits with his children. Even in this short period of time, however, Trimble testified that a recognizable bond developed between Father and the children. The interaction between Father and the children improved with each visitation, and Father's interactions with the children were always appropriate. We recognize that Father's incarceration limited the efforts DSS could employ in attempting to satisfy the required standard of active efforts to rehabilitate the family. *See In re* D.G., 2004 SD 54, ¶17, 679 NW2d 497, 502. Importantly, the concept of "active" efforts pursuant to ICWA is distinguished from

#24996

"reasonable" efforts, as required by the Adoption and Safe Families Act (ASFA). *See In re J.S.B., Jr.*, 2005 SD 3, ¶17, 691 NW2d 611, 617.

> A . . . distinction between [ICWA and ASFA] . . . is the requirement in ICWA that state agencies make "active" efforts to provide services aimed at the prevention of a family breakup. ICWA provides no exception to this mandate. On the other hand, in an attempt to assist states in increasing the speed with which children might achieve the desired goal of permanency, ASFA recognizes certain circumstances under which no "reasonable efforts" may be necessary. ASFA relieves states from making merely perfunctory remedial efforts in cases where a court has found that the parent has subjected the child to aggravated circumstances of abuse or neglect.

*Id.* But here we need not determine whether DSS's efforts satisfied the "active efforts" requirement because there was no evidence that DSS's efforts were *unsuccessful* or that they *failed*, even though they were limited by Father's incarceration.[2] In fact, the evidence demonstrated that the visitation and parenting

---

2. This case is distinguishable from the facts of *In re J.S.B., Jr.*, 2005 SD 3, 691 NW2d 611, where the evidence demonstrated that DSS's efforts were, in fact, unsuccessful. In *J.S.B., Jr.*, the father's whereabouts were initially unknown and therefore DSS remedial services and rehabilitative programs could not be offered. *Id.* ¶25. After it was discovered that the father was incarcerated, the DSS caseworker offered him a Family Service Agreement, which he, at first, refused to sign because it required him to undergo a chemical dependency evaluation and follow its recommendation. *Id.* ¶26. The father denied having a problem with alcohol. *Id.* Furthermore, only ten days after being released from jail, the father appeared at a review hearing on this case and was intoxicated. *Id.* ¶27. He began an outpatient treatment program the following month, but failed to complete it. *Id.* The record reflected that the father continued to consume alcohol and did so the Friday before the final dispositional hearing. *Id.* Clearly, DSS's efforts proved to be unsuccessful. *See id.*

information were beneficial to reuniting this family and fostering healthy relationships.[3]

[¶21.]     Father also maintains that the court's decision to terminate his rights was clearly erroneous because "less restrictive alternatives had not been fairly considered, much less exhausted." This Court is "acutely aware that termination of parental rights is a drastic, final step that should be exercised with great caution." *In re* B.E., 287 NW2d 91, 95 (SD 1979). In terminating a parent's rights, the trial court must find that it is in the children's best interest and that no narrower means of providing for their best interests and welfare existed. *In re* J.Z., 410 NW2d 572, 574 (SD 1987) (citations omitted).

[¶22.]     The trial court's finding that termination of Father's rights was the least restrictive alternative and in the children's best interests hinged on Father's incarceration. We recognize that "when assessing what options are available to prepare the parent for the return of a child, incarceration narrows the available options." *D.G.*, 2004 SD 54, ¶17, 679 NW2d at 502. Nonetheless, "[t]he decision to

---

3.     Trimble opined that father's parental rights should be terminated in an effort to provide stability and permanency in the children's lives. ICWA and ASFA have different priorities. As this Court previously stated:

> ICWA differs from ASFA in its means of promoting Indian children's best interests. ICWA ensures the best interests of Indian children by maintaining their familial, tribal, and cultural ties. It seeks to prevent capricious severance of those ties, whereas ASFA identifies permanency as a major consideration in promoting the best interests of children.

*J.S.B., Jr.*, 2005 SD 3, ¶17, 691 NW2d at 617. Importantly, ASFA does not override, or otherwise modify ICWA, and, when applicable, ICWA trumps ASFA. *Id.* ¶¶18-23.

terminate requires evidence of sufficient magnitude to convince the trial court that the best interests of the children *require* the breakup of the family unit." *In re* S.S., 334 NW2d 59, 61 (SD 1983) (emphasis added). "If, on a review of the record, it appears that the state's compelling interest in the well-being and welfare of the children can reasonably be [e]nsured by less intrusive means, we must order that those alternatives first be implemented." *S.R.*, 323 NW2d at 888.

[¶23.] The record indicates that Grandmother was willing to be a long-term placement option for these children. Her home study had been approved, and only one final requirement remained for her to become a registered foster care provider. Grandmother's sister also showed interest in being a placement option. Neither of these two possibilities was explored. Father was scheduled for release from jail in December 2008, which was seven months away from the date of the dispositional hearing. Due to his limited incarceration period, legal guardianship would have been a less restrictive alternative until Father was able to care for his children.

[¶24.] Notably, the children's attorney did not advocate for termination of Father's rights, and it cannot be ignored that the ICWA expert testified that termination of Father's parental rights, at that time, was premature. We agree. Based on the circumstances of this case, the trial court erred in terminating Father's parental rights.

[¶25.] **2.** **Whether the trial court erred in allowing Luke Yellow Robe to testify as an ICWA expert.**

[¶26.] "[T]he trial court is always vested with the sound discretion to decide whether a witness meets the foundational requirements for testifying as an expert." *In re* T.I., 2005 SD 125, ¶32, 707 NW2d 826, 838. *See also D.G.*, 2004 SD 54, ¶12,

679 NW2d at 501 (citation omitted). "A trial court's rulings in this area will be disturbed on appeal only if its discretion was clearly abused." *Id*.

[¶27.]     ICWA provides:

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, *including testimony of qualified expert witnesses*, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 USCA 1912(f) (emphasis added). "The underlying task of the expert's testimony in ICWA cases is to provide the court with an understanding of the social and cultural aspects of Native American families and the childrearing practices of the child's tribe." *In re* O.S., 2005 SD 86, ¶8, 701 NW2d 421, 425.

[¶28.]     With regard to its decision to qualify Yellow Robe as an ICWA expert, the trial court found he "possess[ed] the requisite skills, training and expertise to qualify as an expert regarding the delivery of child protection services in this case." This finding is supported by the record. Father failed to show the trial court abused its discretion by qualifying Yellow Robe as an expert witness. The trial court is affirmed on the second issue.

[¶29.]     GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.